**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHLEEN D. BOGGS, on behalf of herself and all other plaintiffs, known and unknown,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 08 CV 1985** |
| **v.** | ) ) | **Chief Judge Holderman** |
| **BROWN PRINTING COMPANY** | ) ) | **Magistrate Judge Valdez** |
| **Defendant.** | ) ) | |

**MEMORANDUM IN SUPPORT OF COMBINED MOTION TO DISMISS**

Defendant Brown Printing Company ("Brown"), files the following Memorandum in Support of its Combined Motion to Dismiss the Complaint filed by Plaintiff Kathleen D. Boggs ("Boggs") as follows:

**I.    Background**

Boggs worked as a Customer Service Representative at Brown's Woodstock, Illinois plant from April 2005 until she resigned in November 2007.  In her complaint, Boggs claims that she was improperly classified as a salaried employee and denied overtime pay.  (Complaint at ¶8.)

Boggs claims in her Complaint that others were treated similarly.  She seeks to maintain an opt-in representative action under 29 U.S.C. §216(b) against Brown.  Boggs also seeks to maintain an opt-out class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for Brown's alleged failure to pay overtime to other current and former employees, allegedly in violation of Illinois wage and hour laws.

Brown currently employs more than 20 Customer Service Representatives at its Woodstock plant.

As of the date of her resignation, Boggs resided in McHenry, Illinois. (See Declaration of Edward Davis and related exhibit, attached as exhibit 1.)  Both McHenry and Woodstock are located in McHenry County.

## II.    Dismissal Is Appropriate In Light of Improper Venue

### A.    Applicable Law

28 U.S.C. §93 establishes the geographic scope of each of the three United States District Courts for the State of Illinois, the Northern, Central and Southern Districts.  28 U.S.C. §93 does not establish divisions for the Central and Southern Districts.  However, the statute does establish divisions within the Northern District of Illinois:

    (1)    The Eastern Division comprises the counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle and Will.  Court for the Eastern Division shall be held at Chicago and Wheaton.

    (2)    The Western Division comprises the counties of Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside and Winnebago.  Court for the Western Division shall be held at Rockford and Freeport.

28 U.S.C. § 93.

The Judicial Code also provides for a manner for curing improper venue:

    The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1404

"When a defendant challenges venue under Rule 12(b)(3) and 28 U.S.C. §1406, it is the plaintiff's burden to establish that venue is proper." *China Industries (USA), Inc. v. New Holland Tire, Inc.*, 2006 U.S. Dist. LEXIS 58959 at *5 (N.D. Ill. 2006) (not transferring diversity case pursuant to 28 U.S.C. § 1406 because a substantial portion of events occurred in

Northern District, but transferring case pursuant to § 1406 for considerations of justice and witness convenience).

**B.**     **Venue in the Eastern Division is Improper**

In Boggs' case, she has chosen the wrong division as designated by 28 U.S.C. §93. Boggs resides in a Western Division County – McHenry, and Brown Printing is located in McHenry County.  Accordingly, Boggs' complaint should be dismissed, or in the alternative, transferred to the Western Division.  28 U.S.C. § 1406.

**III.    Even if Her Complaint is Not Dismissed for Improper Venue, It Should be Transferred**

**A.**     **Applicable Law**

Even if the Court was to find that it was permissible for Boggs to bring her lawsuit in the Eastern Division, her lawsuit should be transferred to the Western Division pursuant to 28 U.S.C. § 1404 for the convenience of parties and witnesses and in the interest of justice.

Transferring divisional venue under 28 U.S.C. §1404 is subject to the same analysis as any other transfer of venue, *Concrete Structures of the Midwest, Inc. v. Treco Construction Services, Inc.*, 1996 U.S. Dist. LEXIS 1660 at *8 (N.D. Ill. 1996).  The factors to consider are the affect that a transfer would have on the convenience of the parties, the convenience of the witnesses and the interests of justice. *Id*. at *9.

While a plaintiff's choice of venue is to be accorded some deference, this deference is given less weight when the plaintiff resides outside the forum chosen. *Id*.  Additionally, the plaintiff's choice has "minimal value" when the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum. *Dunn v. Soo Line Railroad Co.*, 864 F. Supp. 64, 65 (N.D. Ill. 1994) (transferring case despite no difference in convenience of the parties between forums).

**B.      Argument**

### 1.      Transfer Would Be More Convenient to the Parties

The distance from Brown's facility and the Eastern Division courthouse is 60 miles; the distance to the Western Division courthouse is 38 miles.  (See Declaration of Paul Patten, attached as Exhibit 2.)  Likewise, Boggs resides in McHenry County.  Thus, it is clearly more convenient to both known parties for this matter to be heard in Rockford.[1]

### 2.      Transfer Would Be More Convenient to the Witnesses

While this matter is in its infancy, Brown anticipates that a number of its current Woodstock management employees will testify at trial.  Brown's Woodstock management employees reside in various locations, but generally in or around McHenry County or the encompassing region.  Given that the Woodstock Plant is generally the epicenter of the such witnesses, and Boggs apparently resides in that region, it is also more convenient for the witnesses for this matter to be transferred to Rockford.  *Dunn*, 864 F. Supp. at 66 (transferring case due in part to the convenience of the fact witnesses, since the plaintiff's personal injury occurred in the forum to which transfer was sought and the witnesses largely resided in that forum).

### 3.      Transfer Is in the Interests of Justice

The "interests of justice" include considerations such as the relationship of the forum, the court and prospective jurors with the occurrence at issue, access to sources of proof, the costs of attendance of witnesses, ensuring speedy litigation and the familiarity of the trial court with the applicable state law.  *Dunn* 864 F. Supp. at 66.

---

[1]  While counsel for both parties maintain offices in Chicago, the convenience of a party's counsel is not one of the factors to be considered in transferring venue.  *Concrete Structures*, 1996 U.S. Dist. Lexis 1660 at *11, *citing Chicago, Rock Island & Pac. R.R. v. Igoe*, 220 F.2d 299, 304 (7th Cir. 1955).

Issues relating to the trial court do not weigh for or against transfer. While the Western Division's docket may otherwise permit speedier resolution of this matter, Brown is aware that this Court moves lawsuits expeditiously despite its case load. Judge Frederick J. Kapala of the Western Division has familiarity with Illinois law based on his immediate prior service as a justice on the Illinois Appellate Court. On the other hand, Brown knows that this Court has frequently addressed issues of Illinois law in the context of diversity and supplemental jurisdiction, and is intimately familiar with federal law and procedure.

Although the issue of judicial assignment does not favor transfer, the remaining interests of justice factors favor transfer. The cost of attendance of witnesses will be lower in the Western Division. Moreover, potential jurors from counties comprising the Western Division will also have a closer connection to the events at issue compared to jurors from the Eastern Division, favoring transfer since the events occurred in the Western Division. *Dunn*, 864 F. Supp. at 67.

## IV.     **Boggs' Rule 23 Class Action Claims Should be Dismissed**

### A.     **Legal Standards**

A Fed. R. Civ. P. 23 class action can be brought only if:

(1) The class is so numerous that joinder of all members is impracticable;

(2) There are questions of law or fact common to the class;

(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

A complaint must *suggest* that a plaintiff has a right to relief by providing allegations that "raise the right to relief above the speculative level." *EEOC v. Concentra Health Services, Inc.*, 496 F.3d 773, 777 (7th Cir. 2007), *quoting Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1968 (2007). It is not enough for a plaintiff to argue that his or her complaint contains allegations that might be consistent with his or her required proofs. *Id.*

**B.    <u>Boggs' Complaint Does Not Suggest that She Can Proceed Under Rule 23</u>**

Boggs' complaint does not allege (1) that the class is so numerous that joinder is impractical, (2) that there are questions of law or fact common to the class, (3) that the claims of the representative parties are typical of the claims of the class; (4) that she will adequately protect the interests of the class.

The Complaint's failure to plead the elements of a Fed. R. Civ. P. 23 class action requires its dismissal. *Van Patten v. Randall Wright*, 2008 U.S. Dist. LEXIS 5972 at *10 (E.D. Wis. 2008) (dismissing class claims for failure to allege Fed. R. Civ. P. 23 class elements in complaint but allowing two named plaintiffs to proceed individually).

V.    **Conclusion**

For the reasons stated above, and those contained in Brown's Combined Motion to Dismiss, Brown requests that this Court (1) dismiss Boggs' action for improper venue or transfer it to the Western Division of the Northern District of Illinois; (2) dismiss the Complaints' Fed. R. Civ. P. 23 claims; and (3) grant whatever other relief the Court deems appropriate.

Dated:  June 9, 2008                    **BROWN PRINTING COMPANY**

                                        By:    /s/ Paul Patten_____
                                               Paul Patten

Cathryn E. Albrecht
Paul Patten
Andrea D. Somerville
Jackson Lewis LLP
320 West Ohio Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 787-4949

<u>**CERTIFICATE OF SERVICE**</u>

I, Paul Patten, an attorney, certify that on this 9th day of June, 2008, a true and correct copy of the foregoing Memorandum in Support of Combined Motion to Dismiss was served via the electronic filing system of the United States District Court for the Northern District of Illinois upon the following:

> John W. Billhorn
> Billhorn Law Firm
> 515 N. State Street
> Suite 2200
> Chicago, IL 60610

> /s/ Paul Patten
> Paul Patten

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN D. BOGGS, on behalf of herself and all other plaintiffs, known and unknown, | ) ) ) ) | |
| Plaintiff, | ) | No. 08 CV 1985 |
| v. | ) ) | Chief Judge Holderman |
| BROWN PRINTING COMPANY | ) ) | Magistrate Judge Valdez |
| Defendant. | ) ) | |

INDEX OF EXHIBITS TO MEMORANDUM IN
SUPPORT OF COMBINED MOTION TO DISMISS

Defendant Brown Printing submits the following exhibits in support of its Memorandum

in Support of Combined Motion to Dismiss:

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Declaration of Edward J. Davis |
| 2 | Declaration of Paul Patten |
| 3 | Lexis cases |

Dated:  June 9, 2008                BROWN PRINTING COMPANY


By:    /s/ Paul Patten_____
Paul Patten


Cathryn E. Albrecht
Paul Patten
Andrea D. Somerville
Jackson Lewis LLP
320 West Ohio Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 787-4949

## <u>CERTIFICATE OF SERVICE</u>

I, Paul Patten, an attorney, certify that on this 9th day of June, 2008, a true and correct copy of the foregoing Index of Exhibits to Memorandum in Support of Combined Motion to Dismiss was served via the electronic filing system of the United States District Court for the Northern District of Illinois upon the following:

> John W. Billhorn
> Billhorn Law Firm
> 515 N. State Street
> Suite 2200
> Chicago, IL 60610

> /s/ Paul Patten
> Paul Patten

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KATHLEEN D. BOGGS, on behalf of herself and all other plaintiffs, known and unknown, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 08 CV 1985 |
| v. | ) ) | Chief Judge Holderman |
| BROWN PRINTING COMPANY | ) ) | Magistrate Judge Valdez |
| Defendant. | ) | |

## DECLARATION OF EDWARD J. DAVIS

I, Edward J. Davis, declare under the penalties of perjury as follows:

1.  I have served as Human Resources Manager at the Woodstock Plant of Brown Printing ("Brown") since September 1, 1998. As Human Resources Manager, I oversee the maintenance of personnel records.

2.  Kathleen Boggs' personnel file indicates that she resided at two addresses during her employment at Brown Printing. In both cases, Ms. Boggs listed her residence as being in McHenry, Illinois, which I know to be in McHenry County.

3.  Brown's Woodstock Plant is located in McHenry County.

4.  It is my opinion from working at Brown that most employees reside in various locations, but generally in or around McHenry County or the encompassing region.

The foregoing is true and correct to the best of my knowledge.

June 9, 2008

Edward J. Davis


EXHIBIT

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN D. BOGGS, on behalf of<br>herself and all other plaintiffs, known<br>and unknown, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 08 CV 1985 |
| v. | ) ) | Chief Judge Holderman |
| BROWN PRINTING COMPANY | ) ) | Magistrate Judge Valdez |
| Defendant. | ) | |

### DECLARATION OF PAUL PATTEN

I, Paul Patten, declare under the penalties of perjury as follows:

1.    I am counsel to Brown Printing ("Brown").

2.    I performed a search under Mapquest to determine the distance from the Eastern Division's Chicago courthouse at 219 South Dearborn, Chicago, Illinois, and Brown's plant in Woodstock, Illinois.  The search indicated a total distance of 60.53 miles.

3.    I also performed a Mapquest search to determine the distance from the Western Division's Rockford courthouse at 211 South Court Street, Rockford, Illinois and Brown's plant in Woodstock, Illinois.  The search indicated a total distance of 38.75 miles.

4.    The foregoing is true and correct to the best of my knowledge.

                                        /s/ Paul Patten
June 9, 2008                        Paul Patten



# EXHIBIT 3

LEXSEE 2006 US DIST. LEXIS 58959 AT *5

**CHINA INDUSTRIES (USA), INC., Plaintiff, v. NEW HOLLAND TIRE, INC., Defendant.**

**No. 05 C 6734**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 58959*

**August 7, 2006, Decided**
**August 7, 2006, Filed**

**COUNSEL:** [*1] For China Industries (USA), Inc, an Illinois Corporation, Plaintiff: Peter Y. Qiu, Law Offices of Peter Y. Qiu, Chicago, IL.

For New Holland Tire, Inc., a Pennsylvanian corporation, Defendant: Alan R. Dolinko, Aleeza M Strubel, Robinson, Curley & Clayton, P.C, Chicago, IL.

**JUDGES:** JAMES F. HOLDERMAN, United States District Judge.

**OPINION BY:** JAMES F. HOLDERMAN

**OPINION**

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On November 29, 2005, plaintiff China Industries (USA), Inc., ("China Industries") invoking this court's diversity jurisdiction pursuant to *28 U.S.C. § 1332*, filed a one-count complaint alleging breach of contract against defendant New Holland Tire, Inc. ("New Holland"). (Dkt. No. 1). New Holland filed a pending motion on January 27, 2006 to dismiss the complaint for lack of personal jurisdiction and improper venue pursuant to *Rules 12(b)(2)* and *12(b)(3)* of the Federal Rules of Civil Procedure ("Rules") and *28 U.S.C. § 1406*, or in the alternative to transfer this case to the Eastern District of Pennsylvania pursuant to *28 U.S.C. § 1404*. (Dkt. No. [*2] 8). New Holland also filed a motion on April 4, 2006 to strike affidavits filed by China Industries. (Dkt. No. 19). For the reasons set forth below, this court grants New Holland's pending motion to the extent that it seeks transfer of the case to the Eastern District of Pennsylvania.

BACKGROUND

According to the complaint, New Holland, through its general manager Stephen Boner, ("Boner") made a contract with China Industries requesting China Industries to locate tires at low prices for the benefit of New Holland. (Dkt. No. 1 at P 5). The parties negotiated the contract terms between their respective offices, China Industries in Illinois and New Holland in Pennsylvania, over a several month period. (*Id.* at P 7). Jane Wang signed the contract on behalf of China Industries on August 31, 2004 in Illinois and mailed the partially executed copy to New Holland in Pennsylvania. (*Id.* at P 8). New Holland then signed the contract and faxed an executed copy to China Industries in Illinois. (*Id.* at P 9). China Industries alleges that it has been fulfilling its promises under the contract by shipping tires and tire related products to New Holland as required under the contract. [*3] (*Id.* at PP 17, 21). The tires and tire related products and produced in, and shipped to, jurisdictions other than Illinois, Pennsylvania or Utah. China Industries argues that New Holland has accepted these shipments and has paid a portion of the invoices. (*Id.* at PP 18, 19, 21, 22). New Holland has allegedly not paid the full balance owed and China Industries argues that it is owed $ 294,102.00. (*Id.* at P 24). China Industries seeks the $ 294,102.00 plus applicable interest, costs and attorney's fees.

LEGAL STANDARDS

A. Personal Jurisdiction

China Industries, as the plaintiff, bears the burden of demonstrating the existence of personal jurisdiction over New Holland. *Cent. States S.E. and S. W. Areas Pension Fund v. Phencorp Reinsurance Co., Inc., 440 F.3d. 870, 875 (7th Cir. 2006)* (citing *Steel Warehouse of Wis., Inc.*


EXHIBIT 3

*v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998)); *see e.g.*, *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 549 (7th Cir. 2004); *Claus v. Mize*, 317 F.3d 725, 727 (7th Cir. 2003); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). China Industries [*4] "need only make a *prima facie* showing that jurisdiction over [New Holland] is proper." *Budget Rent a Car Corp. v. Crescent Ace Hardware*, 2003 U.S. Dist. LEXIS 12084, No. 03 C 930, 2003 WL 21673932, at *2 (N.D. Ill. July 16, 2003) (citing *Michael J. Neuman & Assocs. v. Florabelle Flowers*, 15 F.3d 721, 724-25 (7th Cir. 1994)); *see e.g.*, *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002) (quoted in *Cent. States S.E. and S. W. Areas Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d. 870, 876-77 (7th Cir. 2006) ("When the district court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing . . . the plaintiff 'need only make out *a prima facie* case of personal jurisdiction.'"))). "The court may receive and consider affidavits from both parties" on the question of jurisdiction, *Interleave Aviation Investors II (Aloha) L.L.C. v. Vangaurd Airlines, Inc.*, 254 F. Supp. 2d 1028, 1031 (N.D. Ill. 2003) (citing *Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 208 F. Supp. 2d 918, 922 (N.D. Ill. 2002)); [*5] *see, e.g.*, *GMAC Real Estate, LLC v. Canyonside Realty, Inc.*, 2005 U.S. Dist. LEXIS 12589, No. 05 C 572, 2005 WL 1463498, at *2 (N.D. Ill. Jun. 15, 2005), and "must resolve all factual disputes in the plaintiff's favor and accept as true all uncontroverted allegations made by both plaintiffs and defendants." *Softee Mfg., LLC v. Mazner*, 2003 U.S. Dist. LEXIS 22760, No. 03 C 3367, 2003 WL 23521295, at *2 (N.D. Ill. Dec. 18, 2003) (citing *Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987); *Allman v. McGann*, 2003 U.S. Dist. LEXIS 5599, No. 02 C 7442, 2003 WL 1811531, at *2 (N.D. Ill. Apr. 4, 2003)).

B. Improper Venue

"When a defendant challenges venue under *Rule 12(b)(3)* [and *28 U.S.C. § 1406*], it is the plaintiff's burden to establish that venue is proper." *Faur v. Sirius Intern. Ins. Corp.*, 391 F. Supp. 2d 650, 657 (N.D. Ill. 2005) (citing *First Health Group, Corp. v. Sanderson Farms, Inc.*, 2000 U.S. Dist. LEXIS 965, No. 99 C 2926, 2000 WL 139474, at *2 (N.D. Ill. Jan. 28, 2000)). Any factual conflicts are resolved in the plaintiff's favor. *Spank! Music and Sound Design, Inc. v. Hanke* [*6] , 2005 U.S. Dist. LEXIS 4507, No. 04 C 6760, 2005 WL 300390, at * 4 (N.D. Ill. Feb. 7, 2005). "In a venue analysis, a court may examine facts outside the complaint in order to determine whether venue is proper." *Faur, 391 F. Supp. 2d at 657* (citing *First Health Group, Corp.,*

2000 U.S. Dist. LEXIS 965, No. 99 C 2926, 2000 WL 139474, at *2).

C. Transfer of Venue

"The task of weighing factors for and against transfer 'involves a large degree of subtlety and latitude' and it is a decision within the discretion of the trial judge." *Hyman v. Hill & Assocs.*, 2006 U.S. Dist. LEXIS 5496, No. C. 6486, 2006 WL 328260, at *2 (N.D. Ill. Feb. 9, 2006) (quoting *Pepsico, Inc. v. Marion Pepsi-Cola Bottling Co.*, 2000 U.S. Dist. LEXIS 2693, No. 99 C 3939, 2000 WL 263973, at *7 (N.D. Ill. Mar. 6, 2000)). "When deciding a motion to transfer venue, the court must accept as true all of plaintiff's well-pleaded facts in the complaint, unless they are contradicted by affidavits or other appropriate evidence from the defendant." *Andrade v. Chase Home Fin., LLC*, 2005 U.S. Dist. LEXIS 32799, No. 04 C 8229, 2005 WL 3436400, at *2 (N.D. Ill. Dec. 12, 2005) (citing *Heil Co. v. Curotto Can Co.*, 2004 U.S. Dist. LEXIS 5183, No. 02 C 782, 2004 WL 725737, at *1 [*7] (N.D. Ill. Mar. 30, 2004); *Plotkin v. IP Axess, Inc.*, 168 F. Supp. 2d 899, 900 (N.D. Ill. 2001)). "Simply because transfer of venue is possible, however, does not mean that it is warranted." *True Value Co. v. Ste. Lucie Rentals, Inc.*, 2005 U.S. Dist. LEXIS 26039, No. 05 C 3035, 2005 WL 2848342, at *1 (N.D. Ill. Oct. 27, 2005)).

ANALYSIS

A. New Holland's Motion to Strike Portions of China Industries' Affidavits

China Industries provided affidavits from Steve Boner, Doug Ginder ("Ginder"), Jane Wang, Ryan Wang and Elaine Chen in support of its response to New Holland's pending motion. On April 4, 2006, New Holland filed a pending motion to strike the portions of Boner, Ginder and Ryan Wang's affidavits arguing that the challenged testimony presented in the affidavits is inadmissible under the Federal Rules of Evidence. (Dkt. No. 19). New Holland argues that Boner and Ginder do not have personal knowledge of the sales information set forth in their affidavits and that Ryan Wang's affidavit includes impermissible hearsay evidence. The court rejects New Holland's argument as to the sales information set forth in Boner and Ginder's affidavits. Boner and Ginder state [*8] that they work in sales portion of the tire business, Boner worked for New Holland and Ginder for China Industries. In his position as General Manager, Boner would have had access to New Holland's prior sales information and therefore he has personal knowledge sufficient to make the statements set forth in his affidavit. Ginder would also have information about New Holland sales as Ginder would know about sales by another company in the industry based on an under-

standing of the general sales practices in the industry. New Holland is correct that Ryan Wang's affidavit does include hearsay information and to the extent that this information is impermissible it is stricken from the court's consideration of the pending motion to dismiss or transfer.

B. Personal Jurisdiction

"A federal district court in Illinois has personal jurisdiction over a party involved in a diversity action only if Illinois courts would have personal jurisdiction." *Michael J. Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc., 15 F.3d 721, 724 (7th Cir. 1994).* "An Illinois state court has personal jurisdiction when the Illinois long-arm statute, the Illinois state constitution and the due [*9] process clause of the federal constitution authorize it." *Joy v. Hay Group, Inc., 2003 U.S. Dist. LEXIS 16045, No. 02 C 4989, 2003 WL 22118930, at *3 (N.D. Ill. Sept. 11, 2003) (citing Cent. States, S.E. and S.W. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 939 (7th Cir. 2000); Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GmbH, 185 F. Supp. 2d 897, 902 (N.D. Ill. 2002); Jones v. Sabis Educ. Sys., Inc., 52 F. Supp. 2d 868, 883 (N.D. Ill. 1999)).*

The "Illinois long-arm statute authorizes personal jurisdiction to the constitutional limits," so the analysis of the Illinois long-arm statute collapses into the constitutional analysis. *Mitchell v. Shiffermiller, 2004 U.S. Dist. LEXIS 457, No. 03 C 4794, 2004 WL 178188, at *2 (N.D. Ill. Jan. 14, 2004) (citations omitted); see 735 ILCS 5/2-209(c) (proving the long-arm statute to assert jurisdiction to the constitutional limit).* Furthermore, although the Illinois Supreme Court has made clear to note that the Illinois constitutional due process requirement is distinct from the federal requirement, *see Rollins v. Ellwood, 141 Ill. 2d 244, 565 N.E.2d 1302, 1316, 152 Ill. Dec. 384 (Ill. 1990),* [*10] "the Seventh Circuit has suggested that since there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction . . . the two constitutional analysis blend together." *GMAC Real Estate, LLC v. Canyonside Realty, Inc., 2005 U.S. Dist. LEXIS 12589No. 05 C 572, 2005 WL 1463498, at *3 (N.D. Ill. Jun. 15, 2005) (citing Wasendorf v. DBH Brokerhaus AG, 2004 U.S. Dist. LEXIS 25107, No. 04 C 1904, 2004 WL 2872763, at *2 (N.D. Ill. Dec. 13, 2004); One Point Solutions, Inc. v. Webb et al., 2005 U.S. Dist. LEXIS 1326, No. 04 C 3850, slip op. at 4-5 (N.D. Ill. Jan. 5, 2005) (internal citations omitted)).*

Personal jurisdiction under the federal due process clause requires that "the defendants must have minimum contacts with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 716 (7th Cir. 2002) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (citations omitted)).* Minimum contacts sufficient to support the exercise of personal jurisdiction is established when the defendants' contacts with the [*11] forum demonstrate that the "defendants purposefully avail themselves of the privileges of conducting activities within the forum state," *Wasendorf, 2004 U.S. Dist. LEXIS 25107, No. 04 C 1904, 2004 WL 2872763, at *3 (citing Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)),* and the "defendants should reasonably anticipate being haled into court" in the forum state. *Id. (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).*

Personal jurisdiction can be categorized as either: (1) general jurisdiction or (2) specific jurisdiction. "A defendant is subject to general jurisdiction in Illinois when the defendant is domiciled in Illinois or where the defendant has continuous and systematic general business contacts with the forum." *Budget Rent a Car Corp., 2003 U.S. Dist. LEXIS 12084, No. 03 C 930, 2003 WL 21673932, at *2 n.5 (internal citations omitted).* "Specific jurisdiction exists when 'the defendant has a lessor degree of contact with the state [than in a general jurisdiction case], but the litigation arises out of or is related to those contacts.'" *Wasendorf, 2004 U.S. Dist. LEXIS 25107, No. 04 C 1904, 2004 WL 2872763, at *3 (citing Logan Prods. v. Optibase, Inc., 103 F.3d 49, 52 (7th Cir. 1996)).* [*12]

This court has both general and specific personal jurisdiction over New Holland. China Industries has provided sufficient information to make a *prima facie* showing that New Holland has been doing business in Illinois on a continuing and systematic basis with two other companies, Flexi-Van Leasing, Inc. and Bay Area Technical Services since the early 1990s. These general contacts include continual shipments of tires to these two Illinois companies during this time period. This court also finds that specific jurisdiction exists in this case as New Holland has purposefully availed itself of the privilege of doing business in Illinois through its contacts with China Industries in this case. It reached out to China Industries while China Industries was located in Illinois through the negotiation of the contract and the payment of 13 invoices paid over a one year period. New Holland also contacted China Industries in Illinois when there were disputes over defects in the tire shipments. The court recognizes that the tires that are the subject of this contract never entered Illinois as they were manufactured and shipped to other jurisdictions. However, New Holland's purposeful entered [*13] into Illinois to negotiate and maintain the contract and therefore New Holland cannot be surprised when China Industries wishes to

bring New Holland into an Illinois court when disputes arise over the contract.

## C. Venue

Building on its personal jurisdiction argument, New Holland argues that venue is not proper in the Northern District of Illinois. However, New Holland is incorrect in its position as a substantial portion of the events or omissions giving rise to the claim occurred in the Northern District of Illinois. This is a breach of contract case and the negotiation of the contract and the alleged breaches of the contract, through the alleged failure to pay, occurred in this district. This court must reject New Holland's argument for dismissal or transfer pursuant to *28 U.S.C. § 1406*. This court, however, agrees with New Holland that this case should be transferred to the United States District Court for the Eastern District of Pennsylvania pursuant to *28 U.S.C. § 1404(a)*. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division [*14] where it might have been brought." *28 U.S.C. § 1404(a)*. "To prevail on a motion to transfer under *§ 1404(a)*, the moving party must demonstrate: (1) venue is proper in both the transferrer and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice." *Event News Network, Inc. v. Thill, 2005 U.S. Dist. LEXIS 26643, No. 05 C 2972, 2005 WL 2978711, at *3 (N.D. Ill. Nov. 2, 2005)* (citing *Pasulka v. Sykes, 131 F. Supp. 2d 988, 994 (N.D. Ill. 2001)*; *TruServ. Corp. v. Neff, 6 F. Supp. 2d 790, 793 (N.D. Ill. 1998)*). This case could be properly brought under *28 U.S.C. § 1391* in both this district and the United States District Court for the Eastern District of Pennsylvania as China Industries' and New Holland's participation in the contract also occurred in the Eastern District of Pennsylvania.

In determining the convenience of the parties and witnesses, the court considers: "(1) the plaintiff's choice of forum, (2) situs of material events, (3) relative ease of access to sources of proof in each forum, including the court's power to compel appearance [*15] of unwilling witnesses at trial, and (4) costs of obtaining attendance of witnesses." *Jurincie v. AG Trucking, Inc., 2005 U.S. Dist. LEXIS 24756, No. 05 C 4585, 2005 WL 2663508, at *2 (N.D. Ill. Oct. 14, 2005)* (citing *Medi USA, L.P. v. Jobst Institute, Inc., 791 F. Supp. 208, 210 (N.D. Ill. 1992)*). The interests of justice is determined by considering "the speed in which the case will proceed to trial, the court's familiarity with the applicable law, and the public's interest in having the case resolved in a particular forum." *Avco Corp. v. Progressive Steel Treating, Inc., 2005 U.S. Dist. LEXIS 22964, No. 05 C 4364, 2005 WL 2483379, at *4 (N.D. Ill. Oct. 6, 2005)* (citing *Sand-*

*ers v. Franklin, 25 F. Supp. 2d 855, 859 (N.D. Ill. 1998)*).

"Normally, the plaintiff's choice of forum is generally given substantial weight under *§ 1404(a)*, particularly when [the] plaintiff chooses its home forum." *Riddell, Inc. v. Monica, 2003 U.S. Dist. LEXIS 13053, No. 03 C 3309, 2003 WL 21799935, at *6 (N.D. Ill. July 25, 2003)* (citing *Symons Corp. v. Southern Forming & Supply, Inc., 954 F. Supp. 184, 186 (N.D. Ill. 1997)*). However, China Industries is no longer located in Illinois, instead [*16] has relocated to Utah, and therefore its choice of forum has lesser value. *See Andrade v. Chase Home Fin., L.L.C., 2005 U.S. Dist. LEXIS 32799, No. 04 C 8229, 2005 WL 3436400, at *3 (N.D. Ill. Dec. 12, 2005)*. Although the events establishing personal jurisdiction and leading to the breach of contract occurred in Illinois, the present status of the case is that China Industries' intervening movement to Utah resulted in its movement of its witnesses and evidence from Illinois to Utah. It appears to the court that the only person remaining in Illinois associated with China Industries in the present case is its lawyer. The evidence, witnesses and parties appear to be located primarily in Utah and Pennsylvania. *Section 1404(a)* only considers the interests of justice and convenience of the witnesses and parties in determining a motion for transfer of venue, the convenience of an attorney is not a factor. China Industries has not ask for a transfer to Utah and so this court, in weighing the appropriateness of the case proceeding in Illinois or Pennsylvania, decides that Pennsylvania is clearly a more appropriate forum for this case.

As a final matter, this court recognizes that the Pennsylvania court [*17] must apply Illinois law. United States District Judges across the country are familiar with the requirements of applying the law of states other than the states where the judges are located. This court is confident that the judge assigned to this case in the Eastern District of Pennsylvania, if required to interpret and apply Illinois law, will do an excellent job.

## CONCLUSION

For the reasons set forth above, this court grants New Holland's motion of April 4, 2006 to strike affidavits filed by China Industries to the extent that the affidavit of Ryan Wang contains inadmissible hearsay. (Dkt. No. 19). New Holland's motion of January 27, 2006 is denied to the extent that it sought to dismiss the complaint for lack of personal jurisdiction and improper venue but is granted as to New Holland's alternatively requested relief of transferring this case to the Eastern District of Pennsylvania pursuant to *28 U.S.C. § 1404*. (Dkt. No. 8). The clerk of the court is requested to transfer this case to the Eastern District of Pennsylvania.

2006 U.S. Dist. LEXIS 58959, *

Date: August 7, 2006                                    Chief Judge, United States District Judge

JAMES F. HOLDERMAN

LEXSEE 1996 U.S. DIST. LEXIS 1660 AT *8

**CONCRETE STRUCTURES OF THE MIDWEST, INC., an Illinois corporation, Plaintiff, v. TRECO CONSTRUCTION SERVICES, INC., formerly known as the Rust Engineering Company, a Delaware corporation, Defendant.**

**No. 95 C 50211**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

*1996 U.S. Dist. LEXIS 1660*

**February 16, 1996, DATED**
**February 16, 1996, FILED**

**NOTICE:**      [*1]  NOT FOR PUBLICATION

**COUNSEL:** ATTORNEY(s) FOR PLAINTIFF OR PETITIONER: Michael F. O'Brien, McGreevy, Johnson & Williams, 850 North Church Street, P.O. Pox 1201, Rockford, IL 61103.

ATTORNEY(s) FOR DEFENDANT OR RESPONDENT: Steven G. M. Stein, Stein, Ray & Conway, 222 West Adams Street, Suite 1800, Chicago, IL 60606.

**JUDGES:** PHILIP G. REINHARD, JUDGE, UNITED STATES DISTRICT COURT

**OPINION BY:** PHILIP G. REINHARD

**OPINION**

***MEMORANDUM OPINION AND ORDER***

**INTRODUCTION**

Plaintiff, Concrete Structures of the Midwest, Inc. ("Concrete Structures"), filed a complaint against defendant, TRECO Construction Services, Inc. ("TRECO"), alleging breach of contract by TRECO. Concrete Structures filed suit in the Western Division of the Northern District of Illinois Jurisdiction is based on *28 U.S.C. § 1332*. TRECO moves for dismissal for improper venue, or in the alternative, to transfer venue to the Eastern Division of the Northern District of Illinois.

**BACKGROUND**

TRECO had entered into a contract with the University of Chicago to design and construct the Advanced Photon Source Structure at the Argonne National Laboratory located in DuPage County, Illinois. On July 31, 1991, TRECO entered into [*2]  a subcontract with Concrete Structures to construct the structural and underground building utilities for the project for a price of $ 21,116,158. Under this subcontract ("Concrete Structures Subcontract"), Concrete Structures was to complete this work in sixteen phases pursuant to a milestone schedule.

In order to meet the demands of the milestone schedule, Concrete Structures entered into a subcontract agreement with Liebovich Structural Fabricating Company ("Liebovich") whereby Liebovich would fabricate and erect the steel for the project for a price of $ 5,122,710 The Concrete Structures-Liebovich subcontract ("Liebovich Subcontract") required Liebovich to meet the milestone schedule of Concrete Structures Subcontract and to keep its fabrication facility in Rockford free of any other work which would interfere with its ability to meet that milestone schedule.

The Concrete Structures Subcontract was executed in DuPage County, Illinois, and was administrated by TRECO at its office in Argonne, Illinois which is also located in DuPage County. Concrete Structures' principal office is located in West Chicago, Illinois which is also situated in DuPage County. The Liebovich Subcontract [*3]  was executed in Rockford, Illinois, located in Winnebago County, but was administrated by Concrete Structures from its office in DuPage County.

Shortly after the execution of the Concrete Structures Subcontract, TRECO started issuing bulletins with change orders to its previous construction specifications. Concrete Structures alleges that these change orders substantially changed the scope of the work to be done and caused delays and suspensions of work for both Concrete

1996 U.S. Dist. LEXIS 1660, *

Structures and Liebovich. Concrete Structures claims that the changes and delays from bulletins 2, 3, 5, 7, 8, and 9 caused it to incur $ 1,601,355 in damages, 69% of which are alleged to have been incurred under the Liebovich Subcontract. Concrete Structures alleges that it requested TRECO to process the design changes quicker, stop the design changes, relieve it from the milestone schedules, and grant it time extensions. Concrete Structures further alleges that TRECO did not respond to these requests until after Concrete Structures and Liebovich had already incurred costs and delay damages. Concrete Structures alleges that the changes required by bulletins 2, 3, 5, 7, 8, and 9 were changes to correct defective specifications [*4] which TRECO provided and that it is was entitled to an equitable adjustment of the contract price. Concrete Structures claims that despite provisions in the contract requiring such adjustments under these circumstances, that TRECO denied all its requests for equitable adjustment. These denials of equitable adjustment are the basis for Concrete Structures' present suit. [1]

> 1 Although Concrete Structures and Liebovich have similar interests in this litigation, Liebovich is not a party, but is prosecuting this action by having its counsel act as lead counsel pursuant to a liquidation and consolidation claim agreement. This agreement also provides that Concrete Structures' counsel shall act as co-counsel.

## CONTENTIONS

TRECO has moved for dismissal or, in the alternative, to transfer venue to the Eastern Division of the Northern District of Illinois. In support of its motion to dismiss, TRECO claims that proper venue lies solely in the Eastern Division because that is where it maintains an office and a substantial [*5] portion of the events or omissions concerning the Concrete Structures Subcontract occurred. Specifically, TRECO contends that the preparation of the construction schedules, processing of the change orders, receipt and issuance of the bulletins from the University of Chicago, and all other administration of the Concrete Structures Subcontract occurred in the Eastern Division. In the alternative, TRECO contends that even if the venue is proper in the Western Division, the court should transfer venue for the convenience of the parties and the witnesses, pursuant to 28 U.S.C. § 1404(a) or § 1406(a). TRECO claims that the majority of the TRECO employees, as well as the nonparty witnesses who are expected to testify, are residents of counties in the Eastern Division. TRECO claims that all relevant documents to the Concrete Structures Subcontract are located in the Eastern Division, and that these documents fill 50 banker's boxes. TRECO further contends that this transfer will not inconvenience Concrete Structures, because it resides in the Eastern Division and Concrete

Structures has entered appearances through both Chicago and Rockford counsel.

In response to TRECO's motion to dismiss, [*6] Concrete Structures contends that, in the absence of a local rule to the contrary, a case may be brought in any division of a district in which venue is proper. Concrete Structures points out that Congress repealed 28 U.S.C. § 1393, which required divisional venue, and contends that because venue is proper in either division of the Northern District of Illinois, TRECO's motion to dismiss must be denied. Likewise, Concrete Structures contends transfer of venue under 28 U.S.C. § 1406(a) is only appropriate when a case has been filed in the wrong district or division. Because venue is proper in the Western Division, Concrete Structures contends that a transfer under section 1406(a) would be improper. Concrete Structures claims that since TRECO is a corporation it is subject to venue in all divisions in which it is licensed to do business, and because TRECO is licensed to do business throughout the State of Illinois, venue is proper in either division of the Northern District of Illinois.

As to the motion to transfer venue pursuant to 28 U.S.C. § 1404(a), Concrete Structures contends that TRECO bears the burden of demonstrating that the convenience of the parties and witnesses strongly [*7] favors transfer to the Eastern Division. Concrete Structures contends that TRECO cannot meet this burden because 69% of the damages from TRECO's breach occurred in the Western Division. Concrete Structures claims that the these damages resulted from the Liebovich Subcontract which was executed in Rockford, and that the witnesses and documents supporting these damages are located in Rockford. In addition, Concrete Structures contends that TRECO conducted two audits of Liebovich's Rockford facilities with employees from its Alabama office, and that Chicago would be no more convenient for those Alabama witnesses than Rockford. For further support, Concrete Structures notes that although Liebovich is not a party to this suit, this suit is being jointly pursued by agreement and Liebovich's counsel, who is located in Rockford, is acting as lead counsel.

## DISCUSSION

Proper venue for a diversity of citizenship action is determined under 28 U.S.C. § 1391(a). Section 1391(a) in pertinent part states:

> A civil action wherein jurisdiction is founded solely on diversity of citizenship may ... be brought only in (1) a judicial district where any defendant resides ... (2) a judicial [*8] district in which a substantial part of the events or omissions giving rise to the claim occurred ... or (3)

a judicial district in which the defendants are subject to personal jurisdiction ... if there is no district in which action may otherwise be brought.

Congress repealed *28 U.S.C. § 1393* and as a result, no statute currently requires divisional venue. *Hogan v. Ford New Holland,* No. 95- C-53, *1995 U.S. Dist. LEXIS 8269, 1995 WL 360466,* at *5 (N.D. Ill. June 15, 1995). It is uncontested that a substantial part of the events giving rise to the alleged breach of contract occurred in the Northern District of Illinois. Therefore, venue is proper in the Northern District of Illinois. Because the Northern District of Illinois has no local rule requiring divisional venue, this case may be brought in either the Eastern or Western Division. *Id.* Since venue is proper, TRECO cannot obtain a transfer of venue pursuant to *28 U.S.C. § 1406(a);* TRECO must proceed under *28 U.S.C. § 1404.*

A motion to transfer venue between divisions is subject to the same analysis as any other transfer of venue. *Carr v. Village of Richmond,* No. 94- C-7355, *1995 U.S. Dist. LEXIS 2583, 1995 WL 103635,* at *1 (N.D. Ill. Mar. 3, 1995). This analysis [*9]  requires that the court consider the affect that a transfer will have on the convenience of the parties; the convenience of the witnesses; and the interests of justice. *28 U.S.C. § 1404(a).* These three factors should be considered in the light of all the circumstances of the case. *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219 (7th Cir. 1986).*

While the initial step in considering whether a transfer of venue is appropriate under *section 1404(a)* is usually to determine whether the action could have been brought in the transferee district, this is unnecessary in an intradistrict transfer, as the action could have been properly filed in either division absent a local rule requiring divisional venue. As already noted, the Northern District of Illinois has no local rule requiring divisional venue, and this case could have been brought in either the Eastern or Western Division. *See Hogan v. Ford New Holland,* No. 95- C-53, *1995 U.S.D. Dist. LEXIS 8269, 1995 WL 360466,* at *5 (N.D. Ill. June 15, 1995).

While a plaintiff's choice of venue is to be accorded some deference, that deference is given less weight when the plaintiff resides outside of the chosen forum. *Home Savings Ass'n. v. State Bank of Woodstock,* [*10]  No. 90- C-1748, *1990 U.S. Dist. LEXIS 14385, 1990 WL 172569,* at *2 (N.D. Ill. Oct. 20, 1990) (citing *SO-COMM, Inc. v. Reynolds, 607 F. Supp. 663, 666 (N.D. Ill. 1985)).* When a plaintiff does not reside in the chosen forum, the plaintiff's choice of forum is merely another factor considered in deciding the motion to transfer venue. *See Countryman v. Stein, Roe & Farnham, 681 F. Supp. 479, 483 (N.D. Ill. 1987); SO-COMM,*

*Inc. v. Reynolds, 607 F. Supp. 663, 666 (N.D. Ill. 1985).* However, it is the movant who bears the burden of establishing that the transfer to the new forum is clearly more convenient. *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219-20 (7th Cir. 1986).*

1. Convenience of the Parties

TRECO contends that the Eastern Division is a more convenient forum for both the parties. In support of that contention, TRECO notes it is uncontested that Concrete Structures resides in DuPage County, that TRECO's office is located in DuPage County, and that the Concrete Structures Subcontract was executed and administrated in the Eastern Division. In addition, all of the documentation concerning the Concrete Structures Subcontract is located in DuPage County. According to the sworn affidavit of Mr. [*11]  Robert J. Smetana, the volume of documents concerning the administration of the Concrete Structures Subcontract exceeds fifty banker's boxes.

In opposition to TRECO's assertion that a transfer will be more convenient for the parties, Concrete Structures contends it will be inconvenienced by a transfer. In support of this contention, Concrete Structures notes the agreement with Liebovich whereby both companies are jointly seeking recourse against TRECO and have agreed that Liebovich's counsel will act as lead counsel. Concrete Structures claims that a transfer to Chicago would therefore inconvenience them.

The fact that Concrete Structures' principal place of business is in the Eastern Division indicates a transfer to the Eastern Division would not inconvenience Concrete Structures. Despite the agreement between Concrete Structures and Liebovich to have Liebovich's counsel prosecute Concrete Structures' claim, Liebovich is not a party to this suit, and its convenience is not considered. Moreover, the inconvenience of a party's counsel is not one of the factors to be considered in transferring venue. *Chicago, Rock Island & Pac. R.R. v. Igoe, 220 F.2d 299, 304 (7th Cir.), cert.* [*12]  *denied, 350 U.S. 822, 100 L. Ed. 735, 76 S. Ct. 49 (1955); Blumenthal v. Management Assistance, Inc., 480 F. Supp. 470, 474 (N.D. Ill. 1979); see also Medicenters of Am., Inc. v. T & V Realty & Equip. Corp., 371 F. Supp. 1180, 1184 (E.D. Va. 1974).* In addition, it is clear that a transfer to the Eastern Division would be more convenient for TRECO. As a result, the court finds that the convenience of the parties weighs in favor of a transfer.

2. The Convenience of the Witnesses.

The convenience of the witnesses is the factor often viewed as having the most weight in determining whether to transfer venue. *Rose v. Franchetti, 713 F. Supp. 1203, 1214 (N.D. Ill. 1989).* On the issue of liability in this suit, it is clear that the majority of the party wit-

nesses who are likely to testify reside in the Eastern Division. The execution and negotiation of the Concrete Structures Subcontract, the preparation of construction schedules, the processing of all bulletins with change orders, the decisions denying relief from the milestone schedules, and the denial of equitable adjustments all were alleged to have occurred in DuPage County. The employees of TRECO likely to testify [*13] on these matters all reside in the Eastern Division. In addition, Concrete Structures' employees who were involved in the execution and performance of the Concrete Structures Subcontract also reside in the Eastern District. Furthermore, the majority of the nonparty witnesses likely to testify concerning the issues of liability (i.e., those from Knight Architects, Engineers & Planners Corporation and the University of Chicago) also reside in the Eastern Division. Although Concrete Structures identifies other TRECO employees from Alabama who are likely to testify, it does not demonstrate how traveling to Rockford would be more convenient for these witnesses.

As to the issue of damages, Concrete Structures contends that 69% of their damages occurred in Rockford, and claims that it has sixteen witnesses from Liebovich who will be inconvenienced if the venue is transferred to the Eastern Division. There is no indication, however that this suit will be predominately concerned with the issue of damages. When issues of liability and damages are at issue, the convenience of the liability witnesses is typically given more weight. *Cf. Kahhan v. City of Fort Lauderdale, 566 F. Supp. 736,* [*14] *739 (E.D. Pa. 1983).* Therefore, even if the damages witnesses are necessary and that none of their testimony is cumulative, the court is persuaded that the balance of convenience of the parties and witnesses lies with transfer of venue to the Eastern Division.

3. The Interests of Justice.

The interests of justice factor focuses on the efficient functioning of the court system. *Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989); Coffey v. Van Dorn Iron Works, 796 F.2d 217, 221 (7th Cir. 1986)* In considering whether the interests of justice favor a transfer of venue, the court considers the relationship of the case to the forum, the familiarity of the trial court to the governing law, access to sources of proof, the availability of unwilling witnesses to service of process, whether a transfer will affect the timing of the litigation, and whether the transfer will conserve judicial resources. *Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989); see also Dunn v. Soo Line R.R. Co., 864 F. Supp. 64, 66 (E.D. Ill. 1994); Espino v. Top Draw Freight System, Inc., 713 F. Supp. 1243, 1245 (N.D. Ill. 1989).* In considering [*15] an intradistrict transfer, however, the interests of justice

factor is given less weight, as a transfer between divisions does not involve any conflict of laws issues, nor does it affect the familiarity of the trial court to the governing law or the availability of unwilling witnesses to service of process. *See Whitmer v. John Hancock Mut. Life Ins. Co.,* No. 87- C-20306, *1989 U.S. Dist. LEXIS 16448, 1989 WL 197400,* at *3 (N.D. Ill. Oct. 2, 1989).

In this case, it is uncontested that the Concrete Systems Subcontract was executed in the Eastern Division, that TRECO's alleged breach of the subcontract occurred in the Eastern Division, and that both Concrete Structures and TRECO either reside or have offices in the Eastern Division. The only connection with the Western Division concerns the damages incurred by Concrete Systems under the Liebovich Subcontract. These facts show that this case has a stronger relationship with the Eastern Division.

Similarly, consideration of the access to the sources of proof also weighs in favor of the Eastern Division. TRECO has a considerable amount of discovery materials concerning the execution and administration of the Concrete Structures Subcontract in its Argonne, Illinois [*16] office. Likewise, as Concrete Structures has its principal place of business in West Chicago, it is likely to have its documents and other records concerning both its contract with TRECO, and its subcontract with Liebovich, in the Eastern Division.

Finally, there is no showing that a transfer would have any negative impact on the judicial resources of the Northern District of Illinois, as the litigation in this case has not yet progressed to any significant stage. Based on these facts, the court finds that the interests of justice will be furthered by a transfer to the Eastern Division. Accordingly, the court finds that a transfer to the Eastern Division pursuant to *28 U.S.C. § 1404(a)* will be more convenient for the parties as well as the witnesses, and will further the interests of justice.

CONCLUSION

For the forgoing reasons, TRECO's motion to dismiss is denied, TRECO's motion to transfer venue pursuant to *28 U.S.C. § 1404(a)* is granted, and this case shall be transferred to the Eastern Division of the Northern District of Illinois.

ENTER:

PHILIP G. REINHARD, JUDGE

UNITED STATES DISTRICT COURT

DATED: [*17] *February 16, 1996*

LEXSEE 864 F. SUPP. 64, 65

**ANGELETTE V. DUNN, Individually and as Special Administrator of the Estate of TERRY DUNN, Deceased, Plaintiff, v. SOO LINE RAILROAD COMPANY, a corporation, Defendant.**

**Case No. 93 C 4648**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*864 F. Supp. 64; 1994 U.S. Dist. LEXIS 11873*

**August 23, 1994, Decided**
**August 24, 1994, Docketed**

**COUNSEL:** [**1**] For ANGELETTE V DUNN, Individually, plaintiff: Philip H. Corboy, Susan J. Schwartz, Robert J. Bingle, David Casey Wise, Corboy, Demetrio & Clifford, P.C., Chicago, IL.

For SOO LINE RAILROAD COMPANY, a corporation, defendant: Thomas F. Tobin, Connelly, Mustes & Schroeder, Chicago, IL.

**JUDGES:** ASPEN

**OPINION BY:** MARVIN E. ASPEN

**OPINION**

[*65] *MEMORANDUM OPINION AND ORDER*

MARVIN E. ASPEN, District Judge:

Plaintiff Angelette Dunn, both individually and as special administrator of the estate of her deceased husband, brings this two-count complaint against defendant Soo Line Railroad Company, alleging negligence and wilful and wanton misconduct in connection with her husband's death. Presently before the court is Soo Line's motion for change of venue pursuant to *28 U.S.C. § 1404(a)*. For the reasons set forth below, Soo Line's motion is granted.

**I. Background**

On October 20, 1992, Terry Dunn was hunting with two companions on and around Soo Line's railroad tracks, rails, and right of way in Ixonia, Wisconsin. He was fatally injured when one of Soo Line's trains struck him. Terry Dunn's wife Angelette, the only named plaintiff in this action, was appointed special administrator of Dunn's estate for the purpose of prosecuting this lawsuit.

Angelette Dunn is a resident of Illinois (as was Terry), while Soo Line is a Minnesota corporation.

**II. Discussion**

Change of venue is governed by *28 U.S.C. § 1404(a)*, which provides:

[**2**]

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

It is undisputed that the present action could have been brought in the Western District of Wisconsin. Accordingly, we shall focus on the convenience of the parties and witnesses and the interests of justice.

We initially observe that, as a general rule, the plaintiff's choice in selecting a forum is entitled to substantial weight, particularly where the plaintiff has chosen her home state as the forum. [1] *See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981)*. However, where the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum, "the plaintiff's preference has minimal value." *Robinson v. Town of Madison, 752 F. Supp. 842, 847 (N.D. Ill. 1990)* (citations omitted). Accordingly, Dunn's selected forum will be but one factor we consider in ruling on Soo Line's motion. [2]

1    Indeed, it is undisputed that the Northern District of Illinois would be more convenient for Dunn, as she is a resident here, than the Western

864 F. Supp. 64, *; 1994 U.S. Dist. LEXIS 11873, **

District of Wisconsin, and neither would be particularly convenient or inconvenient for Soo Line, since it does business in both districts.

[**3]

2    Dunn argues that "where a plaintiff is a minor, the court should be even more careful of changing venue." Terry and Angelette Dunn's minor children, however, are not listed as plaintiffs in this action.

We next turn to convenience of the witnesses. In resolving a motion to transfer, the convenience of witnesses is one of the most important factors to be considered. *Rose v. Franchetti, 713 F. Supp. 1203, 1214 (N.D. Ill. 1989)*. In reviewing each party's list  [*66]  of proposed witnesses in the Joint Pretrial Order, it is apparent that the vast majority of relevant witnesses are either located in the Western District of Wisconsin or outside of both the Western District of Wisconsin and the Northern District of Illinois. [3] Both parties specifically identify several law enforcement personnel who investigated the accident, including Lieutenant Robert K. Henze, Deputy Mike Schloesser, and Deputy Robert Meyer of the Jefferson County Sheriff's Office, Officer Tryg Aasen of the Ixonia Police Department, and Jefferson County Assistant Coroner Gary Scherer, all of whom live and/or [**4] work in the Ixonia area. [4] In addition, Dunn lists ten other witnesses who live in Watertown, Wisconsin, near the accident site. The only eyewitnesses to the accident reside in Milwaukee, Wisconsin, which is roughly equidistant between Chicago and Madison, where a trial in the Western District of Wisconsin would be held. Finally, of the approximately eighteen witnesses who actually reside in the Chicago area, fully two-thirds are expected to testify about Terry Dunn's relationship with his family. As noted above, much of this evidence would be cumulative, and almost certainly excluded. We shall therefore discount this already limited number of individuals who would be somewhat inconvenienced by a trial in the Western District of Wisconsin. [5] In sum, it is readily apparent that the convenience of the witnesses overwhelmingly favors transfer.

3    Relying on *Midwest Precision Services, Inc. v. PTM Industries Corp., 574 F. Supp. 657, 659 (N.D. Ill. 1983)*, Dunn suggests that Soo Line's assertions regarding the convenience of witnesses are entitled to no weight, because Soo Line failed to provide "affidavits, depositions, or stipulations" regarding the residences of alleged key witnesses. *Midwest Precision Services,* however, allows a court to consider facts submitted by way of "affidavit, deposition, stipulation *or other relevant document." Id. at 659*. The Joint Pretrial Order is precisely such a document, and reliance on it is therefore appropriate in this context. *See,*

*e.g. Coleman v. Mobil Oil Corp., 643 F. Supp. 1104, 1106 (E.D. Tex. 1986)* (relying on witnesses identified in pretrial order as basis for granting motion to transfer).

We also note that Dunn has submitted affidavits from only eight individuals, including herself, all of whom (conveniently enough) are located in Chicago. Dunn fails to acknowledge that she has identified forty-nine other witnesses, at least fifteen of whom live and/or work in Ixonia, Watertown, or Jefferson County, where the accident occurred. Furthermore, the only subject about which the non-party affiants will testify is the Dunns' familial relationship and the concomitant loss suffered by Terry Dunn's surviving family members. That same testimony is expected to be offered by four other Chicago residents and seven Missouri residents. Whether this seemingly cumulative testimony will be allowed by the court which eventually presides over this trial is doubtful. Accordingly, Dunn's claim of inconvenience to a large number of "necessary" witnesses is dubious.

[**5]

4    In their memorandum in response to Soo Line's motion, Dunn states:

Indeed, SOO LINE even states that the coroner is from the Ixonia, Wisconsin area. TERRY DUNN was killed when he was struck by a train. There is no dispute to that fact. What the coroner could add to this case is questionable.

Ironically, enough, however, Dunn also lists the coroner, Gary Scherer as a potential witness. We are unwilling to accept Dunn's suggestion that Scherer's contributions would be insignificant when she herself includes him on her witness list.
5    Of Dunn's five expert witnesses, only one resides in the Chicago area. Of the two who live in the Midwest (one is located in Indianapolis, the other in Champaign), both reside over 100 miles from the courthouse. The remaining experts, Edward Karnes and Robert H. Raney, reside in Colorado and Montana, respectively. The inconvenience to the non-Chicago experts, and particularly those from the Western states, would therefore not change significantly were we to transfer this case from Chicago to Madison.

The same is true with respect to the "interest of [**6]  justice" factor. This factor includes such consid-

864 F. Supp. 64, *; 1994 U.S. Dist. LEXIS 11873, **

erations as the relationship of the forum, the court, and prospective jurors with the occurrence at issue, access to sources of proof, the cost of attendance of willing witnesses, as well as the amenability to service of process of unwilling witnesses, ensuring speedy litigation, and the familiarity of the trial court with the applicable state law. *See Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989); Zalutsky Pinski & Di-Giacomo, Ltd. v. Kleinman 747 F. Supp. 457, 462-63 (N.D. Ill. 1990).* In the present case, the occurrence at issue is the striking of Terry Dunn by Soo Line's train; that event occurred in the Western District of Wisconsin while Terry Dunn was hunting around Soo   [*67] Line's tracks. [6] As a result, the community has a close connection to the accident. Furthermore, as stated above, most, if not all, of the occurrence witnesses are located in the area of the accident, including the investigative personnel. These witnesses lie outside of this court's compulsory process range, and thus could not be compelled to testify at a trial in   [**7]   this district if they are unwilling appear voluntarily. As for willing witnesses, there will be cost involved for non-local witnesses regardless of where this trial is held; however, a significant number of Dunn's proposed witnesses live in the immediate vicinity of the accident, while comparatively few live in the Chicago area. Accordingly, the total cost of attendance for willing witnesses would likely be somewhat at a trial in Madison than in Chicago. Soo Line also notes that the average judge in the Western District of Wisconsin currently has approximately 250 cases pending, while the average caseload per judge in the Northern District of Illinois is approximately 350 cases per judge. Soo Line therefore argues that the relative congestion of the two courts militates in favor of transfer, a contention not rebutted by Dunn.

6   Dunn suggests that "material events" also occurred in Chicago, and includes among those events Terry Dunn's childhood and development, his friends, and his family. While these people and events may be material to Terry Dunn's life, the "occurrence," "material event," or "underlying cause of action" in this action is solely Terry Dunn's death and the facts surrounding it.

[**8]   Finally, we observe that one of the most important issues to be considered is the familiarity of the trial court with the law to be applied in the case. *Cf. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981)* (forum non conveniens analysis). Both in its mo'ion to transfer and in its pending motion for summary judgment, Soo Line argues that the substantive law of Wisconsin would apply to this case, based upon Illinois choice of law principles. Dunn has not challenged this assertion in her response to either motion, and we therefore accept Soo Line's proposition for the purpose of its motion to transfer. Because a court in the Western District of Wisconsin would be far more familiar with Wisconsin law than this court, this factor clearly supports transfer. In sum, both the convenience of the witnesses and the interest of justice strongly favor transfer, and we therefore grant defendant's motion.

### III. Conclusion

For the reasons set forth above, defendant Soo Line Railroad Company's motion for change of venue is granted. This case is transferred to the Western District of Wisconsin.   [**9]   It is so ordered.

MARVIN E. ASPEN

United States District Judge

Dated August 23, 1994

LEXSEE 220 F.2D 299, 304

**CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, a corporation, Petitioner, v. Honorable Michael L. IGOE, Judge of the United States District Court for the Northern District of Illinois, Eastern Division, Respondent**

No. 11247

**UNITED STATES COURT OF APPEALS, SEVENTH CIRCUIT**

*220 F.2d 299; 1955 U.S. App. LEXIS 3344*

**February 16, 1955**

**COUNSEL:** [**1] 1292 *1

O. L. Houts, Chicago, Ill., for petitioner.

James A. Dooley, Chicago, Ill., for respondent.

**JUDGES:** Before DUFFY, Chief Judge, and MAJOR, FINNEGAN, LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.

**OPINION BY:** DUFFY

**OPINION**

[*300]  This is a petition for a Writ of Mandamus seeking an order directing the respondent to transfer from the United States District Court for the Northern District of Illinois, Eastern Division, to [*301] the District Court for the Southern District of Iowa, pursuant to *28 U.S.C.A. § 1404(a)*, the case entitled 'Claudine M. Mikesell, Administrator of the Estate of Charles Delbert Mikesell, Deceased, plaintiff, v. Chicago, Rock Island and Pacific Railroad Company, defendant, Civil Action No. 52 C 2124.'

This proceeding is here for the second time. In the previous proceeding the respondent insisted that this Court did not have the power to entertain a petition for mandamus in a case of this nature. We held, *Chicago, R.I. & P.R. Co. v. Igoe, 7 Cir., 212 F.2d 378, 382*, that mandamus would lie and after citing various authorities, including *Dairy Industries Supply Ass'n v. La Buy, 7 Cir., 207 F.2d 554* [**2] we said: 'We adhere to the Dairy Industries decision 1292 *2 and remand the cause to the District Court with directions to vacate the order denying the transfer and to reconsider petitioner's motion in the light of the views expressed herein.' (*212 F.2d 382*.) After the remand the District Court entered an

order again denying the petition to transfer, and filed a memorandum in which the District Judge stated: '* * * I have reached the conclusion that it would not be for the convenience of the parties and the witnesses, nor in the interests of justice to transfer this case to either of the Iowa Districts requested in the petition of the defendant.'

On September 14, 1951, Charles D. Mikesell and Claudine Mikesell, husband and wife, were residents of Des Moines, Iowa. On that date Charles Mikesell was driving an automobile in the village of Avoca, Iowa, and in passing over the tracks of the Rock Island Railroad, was struck by a train operated by the Railroad and was killed. Avoca is located within the Western Division of the Southern District of Iowa. The District Court of Polk County, Iowa, issued letters of administration to Claudine Mikesell and on September 13, 1952, in [**3] her capacity as administratrix, she commenced an action against said 1292 *3 Railroad in the Superior Court of Cook County, Illinois, claiming damages for wrongful death.

The Railroad, on the grounds of diversity of citizenship, caused the Mikesell case to be removed from the Superior Court of Cook County to the United States District Court for the Northern District of Illinois. Thereafter, the Railroad filed a motion under *28 U.S.C.A. § 1404(a)* [1] to transfer the cause to the United States District Court for the Southern District of Iowa for trial in either its Central Division sitting at Des Moines, or its Western Division sitting at Council Bluffs.

1.    § 1404(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.'

It is without dispute that on and prior to September 14, 1951, the date of the death of Charles Mikesell, he

and his wife were [**4] residents of Des Moines, Iowa; that letters of administration were issued to plaintiff by the District 1292 *4 Court of Polk County, Iowa; and plaintiff continued to reside in Des Moines, Iowa on the date when she commenced suit against the Railroad in the Superior Court of Cook County, Illinois. Further, it is averred, in the affidavit filed upon behalf of the Railroad, that in order to defend plaintiff's action, petitioner will be required to call two non-employee witnesses residing at Des Moines, six non-employee witnesses residing at Avoca and five employee witnesses residing at Des Moines and Avoca; that the testimony of said non-employee witnesses can be obtained only by subpoena and that the legal process of the United States District Court for the Northern District of Illinois does not extend to any of the localities where such witnesses reside. It was also shown that Des Moines is 358 miles from Chicago; that Avoca is 459 miles from Chicago, but that Avoca is 33 miles from Council Bluffs and 104 miles from Des Moines; that all of the witnesses petitioner expects to call in its defense are within the range of legal process which can be issued by the United [**5] [*302] States District Court for the Southern District of Iowa. Petitioner's affidavit also asserted that 1292 *5 it would be impossible for it to properly present its defense by depositions as it could not, in advance, anticipate evidence which may be offered by the plaintiff.

Plaintiff opposed petitioner's motion to transfer and filed an affidavit which disclosed that on May 2, 1953 she married one M. L. Davis and since June, 1953, she and Davis have resided in Lombard, Illinois, in a home which they have purchased and that she now considers Lombard as her permanent residence.

Plaintiff's counsel filed an affidavit showing that petitioner's main offices are in Chicago, Illinois; that the train service between Avoca and Des Moines is poor, the trip consuming 2 1/4 hours, while the train service between Des Moines and Chicago was much more frequent, the trip taking about 6 hours. The affidavit also stated that plaintiff had hired an attorney residing in Chicago, Illinois, and that if the case were tried in Iowa that plaintiff would be put to the expense of hiring an additional attorney.

When the petition for transfer was first presented to the District Judge he denied [**6] the motion '* * * on the general proposition that the place where this accident occurred is about as close to Chicago as to 1292 *6 Des Moines where you want to have the case tried, and this case was started in the State Court and you folks transferred it over to the Federal Building evidently for the purpose of having a trial, and as soon as it got here the only trial you wanted was to ship it out to Iowa, I don't think § 1404(a) was ever established or ever

enacted for that reason * * *.' In our previous opinion we pointed out that the reasons given by the District Judge for denying the petition were not valid, and we stated 'The governing tests are expressly stated in the Act, and a leading mandamus case points up the correct guides to their application to a particular fact situation, which include 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; possibility of view of premises, (if necessary); and all other practical problems that make trial of a case easy, expeditious and inexpensive * * *. The Court will weigh relative advantages and obstacles to [**7] fair trial. *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (67 S.Ct. 839, 91 L.Ed. 1055).*" We then remanded this case with directions to vacate 1292 *7 the order denying the transfer and to reconsider petitioner's motion in the light of the views that we expressed in our opinion

Plaintiff invokes the doctrine of res judicata based on the statement in our previous opinion herein, 'Ultimate decision on that motion is within the province of the District Court, and we cannot, as petitioner would have us do, usurp its function and decide the question in this court.' All we intended to say was that the District Court must, initially, make the decision by applying the statutory tests laid down in *§ 1404(a)*, viz., '* * * convenience of parties and witnesses, in the interest of justice * * *.' We thought we clearly delineated the scope of our decision when we stated: 'However, this opinion deals with the existence of power only, not with the permissible limitations on its exercise.' It is clear that the doctrine of res judicata has no application. Furthermore, we feel there is no inconsistency between this opinion and our previous opinion in this case.

In considering [**8] the three factors prescribed by the statute, the District Court should bear in mind that in filing an action the plaintiff is permitted to choose any proper forum and that 1292 *8 the plaintiff's choice of forum should not be lightly set aside. In acting on such motion the District Judge has a broad discretion, but in exercising this discretion he is limited in his consideration to the three factors specifically mentioned in *§ 1404(a)*, and he may not properly be governed in his decision by any other factor or consideration. *Dairy Industries Supply Ass'n v. La Buy, supra, 207 F.2d at pages 557-558.*

[*303] Whether the plaintiff followed the litigation or whether, by an unusual coincidence, she moved to the Northern District of Illinois because of her second marriage, is, as we see it, not of great importance. Although plaintiff was not a witness to the collision at Avoca, Iowa, she, undoubtedly, might be called to testify at the trial as to undisputed matters, and we think, under the circumstances of this case, if the first test alone were

to be considered, viz., 'convenience of the parties', that the trial judge acted within his discretion in refusing [**9] to order the transfer. But the statute requires the application of two additional tests.

As to the second test 'convenience of witnesses' it is self-evident that the convenience of both plaintiff's 1292  *9 and defendant's witnesses would be served by a trial of the cause in the Southern District of Iowa. A number of witnesses reside at Avoca which is 459 miles from Chicago but only 33 miles from Council Bluffs and 104 miles from Des Moines, the two cities where the trial might be held. The other witnesses apparently all reside at Des Moines. Plaintiff's counsel argues that train service between Avoca and Des Moines is poor, but we assume the highways in that area are suitable for automobile travel, and that Iowa, like other states, has the benefit of extensive bus service. There is nothing in this record to indicate the convenience of witnesses will be served by a trial in Chicago. There is no factual basis in this record for the respondent's conclusion to the contrary.

The third test under the statute is 'in the interest of justice'. The phrase connotes conditions which are in furtherance of the administration of justice. It has been held that the phrase should be [**10] given paramount consideration. *Greve v. Gibraltar Enterprises, Inc., D.C.*, 85 F.Supp. 410, 413. Both the interest of the parties to the lawsuit as well as society in general should be considered. *United States v. 1292  *10 National City Lines, Inc., D.C.*, 7 F.R.D. 393, 397, 402. In the interest of justice there should be considered the relative ease of access to sources of proofs; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; the possibility of a view of the premises; and the state of the court calendar both in the District where the case is pending, and in the District to which it is sought to have the case transferred.

A number of courts have given consideration to the congested state of their calendars in considering a motion to transfer. *Rhoton v. Interstate R. Co., D.C.*, 123 F.Supp. 34; *Glasfloss Corporation v. Owens-Corning Fiberglas Corporation, D.C.*, 90 F.Supp. 967; *United States v. E. I. Du Pont DeNemours & Co., D.C.*, 83 F.Supp. 233; *Hansen v. Nash-Finch Co., D.C.*, 89 F.Supp. 108; *Healy v. New York, New Haven & Hartford R. Co., D.C.*, 89 F.Supp. 614. [**11]

The calendar for the District Court of the Northern District of Illinois is congested. [2] There is no apparent reason why this case could not be brought to trial promptly in the Southern District of Iowa.

2.    The annual report of the Director of the Administrative Office of the U.S. Courts issued

September, 1954 states: (A-27) 'The Northern District of Illinois -- This large metropolitan district with 8 judges succeeded in reducing the number of pending civil cases from 3170 to 2497, but the reduction was almost entirely in United States cases. The private caseload per judge both of cases filed and cases pending is far heavier than average and the median interval from filing to disposition was 15.1 months in 1954 as compared with 14.8 months in 1953 and over 15.5 months for each of the three previous years. Although the court regularly disposes of a considerably larger number of cases per judge than the national average, a substantial reduction in the number of private cases is necessary to insure prompt disposition of civil business. Almost 80 percent of the cases filed in 1954 were private cases compared with the national average of 66 percent.'

[**12]    1292  *11

Possibly the real motive for plaintiff's vigorous opposition to the transfer of this case is the hope and expectation that a verdict for a larger sum would be [*304] returned in Chicago than in the Southern District of Iowa. Also, the Railroad might hope for a lower verdict in Iowa. Such results might well obtain, but we cannot consider those speculative factors as reasons either for or against a transfer, nor does *§ 1404(a)* provide that the convenience of counsel is a factor to be considered. *United States v. Scott & Williams, Inc., D.C.*, 88 F.Supp. 531, 535; *Henderson v. American Airlines, Inc., D.C.*, 91 F.Supp. 191, 193.

We agree with the statement of the court in *Josephson v. McGuire, D.C.*, 121 F.Supp. 83, 84: 'A large measure of deference is due to the plaintiff's freedom to select his own forum. Yet this factor has minimal value where none of the conduct complained of occurred in the forum selected by the plaintiff * * *.' In this case there is no controverted question which depends on any event occurring in the Northern District of Illinois. Both parties must rely upon evidence of events entirely removed [**13] from that District. *B. Heller & Co. v. Perry*, 7 Cir., 201  1292  * 12 F.2d 525, 527.

The writer of this opinion feels confident that had he been sitting in the District Court when the motion for transfer was made, an order for transfer would have been entered without hesitation. But what he or any other judge might have done in the circumstances is not the test we must apply in deciding this case. To warrant action by us, there must be something more than an erroneous decision. Our problem is, was the refusal by the District Judge to order the transfer, an abuse of discretion? *B. Heller & Co. v. Perry, 7 Cir., 201 F.2d 525,*

*527*; *Dairy Industries Supply Ass'n v. La Buy, 7 Cir., 207 F.2d 554, 558; Ford Motor Co. v. Ryan, 2 Cir., 182 F.2d 329,* certiorari denied *340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624.* Was respondent's denial of the transfer 'so 'clearly erroneous' as to amount to an abuse of his discretion?' *General Portland Cement Co. v. Perry, 7 Cir., 204 F.2d 316, 319.*

The only possible factor to support the refusal to transfer is that the plaintiff chose a state court in Cook County, Illinois, [**14] as a forum, and that about nine months after she commenced such action, she moved from the Southern District of Iowa to the Northern District of Illinois.    1292 *13 We give little weight to the claim that plaintiff will be required to hire an Iowa attorney if the transfer is ordered. [3]

> 3.    If plaintiff signed a contingent fee contract as is so often done in wrongful death cases, it is probable that any such expense would be an obligation of plaintiff's attorney.

Factors under the statute which demonstrate that a transfer should be made are: convenience of witnesses of both plaintiff and defendant; the ease of access to sources of proof; the availability of compulsory process to compel the attendance of unwilling witnesses; the smaller amount of expense required for willing witnesses; the availability of a view of the premises; the congestion of the District Court calendar in the Northern District of Illinois, Eastern Division; that no controverted issue of fact depends upon any event that occurred in the [**15] Northern District of Illinois; and the burden of a jury trial should not be imposed upon the Northern District of Illinois, an area which has no relation to the litigation. 1292 *14 [4]

> 4.    As was well stated in *Gulf Oil Copr. v. Gilbert, 330 U.S. 501, 507, 508-509, 67 S.Ct. 839, 843, 91 L.Ed. 1055,* 'Factors of public interest also have a place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin.  Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.'

Another factor to be considered is plaintiff acts in a representative capacity and was appointed by an Iowa State Court.  Authorization of that Court would be required in order for plaintiff to make a settlement, and plaintiff must account to that Court for any sums received by settlement or litigation, and distribution of any such sums would be  [*305] under the [**16] jurisdiction of the Iowa State Court.

One additional point raised by the attorney for respondent should be noted.  The claim is made that the petition for mandamus is insufficient because the names 1292 *15 of the witnesses were not stated.  The decision of this Court in *General Portland Cement Co. v. Perry, 204 F.2d 316* is cited.  No request was made for the production of the names of defendant's witnesses.  As far as this record shows all witnesses bearing on the subject of defendant's alleged liability reside in the Southern District of Iowa.  In any event, the point was not raised in the Court below.  Such objection cannot be raised here for the first time.  *Hopkins v. Waco Products, Inc., 7 Cir., 205 F.2d 221, 224; Kainz v. Anheuser-Busch, Inc., 7 Cir., 194 F.2d 737, 744; Apex Smelting Co. v. Burns, 7 Cir., 175 F.2d 978, 982; McComb v. Goldblatt Bros., Inc., 7 Cir., 166 F.2d 387, 389-390.*

The balance of convenience of the parties is so overwhelmingly in favor of the defendant that we hold the denial by respondent of the motion to transfer this case to the Southern District of Iowa was so clearly erroneous [**17] that it amounted to an abuse of discretion.

Let a Writ of Mandamus issue directing the Respondent 1) to vacate and set aside the order entered July 7, 1954; and 2) to enter an order transferring this cause for trial to the Southern District of Iowa, in either the Central or Western 1292 *16 divisions thereof.

It is So Ordered.

**DISSENT BY:** FINNEGAN

**DISSENT**

FINNEGAN, Circuit Judge (dissenting).

An en banc hearing as one of three oral arguments and two briefings, on each side, is quite enough of this case.  Several serious matters of policy and principle, however, concerning mandamus, impel me to expand this dissent and express my views on some broader aspects of the majority opinion.  This entire episode illustrates problems following in the wake of generously encouraged repetitive invocations of mandamus.

I would have allowed the respondent Judge's motion to dismiss the Railroad's second petition for a writ of mandamus, and rested my determination on the reasons expressed in this dissent.

A major point of my divergence, from the majority opinion, is stressed by tracing, chronologically, the various stages through which this matter passed after suit was filed, September 13, 1952, in [**18] the Superior Court of Cook County, Illinois.  Petitioner here, defendant-Railroad, removed the case from that State court, October 6, 1952, to the district court below.  Four days

later petitioner invoked *28 U.S.C.A. § 1404(a)* and moved for a transfer to one of two districts in Iowa, the Eighth 1292 *17 Circuit. Objections to petitioner's motion were interposed, June 12, 1953, on behalf of the plaintiff-widow-administratrix. It was respondent's order, entered eight days later, which stimulated the Railroad's first petition for a writ of mandamus to compel the transfer, and that resulted in an opinion reported as *Chicago, R.I. & P.R. Co. v. Igoe, 7 Cir., 1954, 212 F.2d 378.*

On remand ordered April 20, 1954, the basic factual showing remained unaltered, save in one respect hereinafter mentioned, and remarkably similar to that outlined in Judge Lindley's opinion, *212 F.2d 378* and now narrated in the Chief Judge's opinion. Confronted with the same papers originally tendered him by the Railroad and plaintiff's objections, by then implemented with her affidavit (filed June 24, 1954) concerning change of residence to Illinois [**19] sometime in May-June, 1953, respondent again denied this transfer.

At this juncture, and parenthetically at least, I recall marginal note 2 of *Chicago, R.I. & P.R. Co. v. Igoe, 7 Cir., 1954, 212 F.2d 378, 379,* viz.:

'Respondent's answer to the petition avers that plaintiff, prior to June 30, 1953, the date petitioner's motion was denied, had moved to, and was 1292 *18 a resident of the Northern [*306] District of Illinois, and on the basis of this averment denies the allegation of the petition that all witnesses to be called by either party are residents of the Southern District of Iowa. It was conceded on oral argument that plaintiff was not a witness to the accident which caused the death of her decedent. On November, 30, 1953, over petitioner's objection, respondent granted a motion that a statement as to this change of residence be certified to this court. Inasmuch as that fact was not before respondent when he denied petitioner's motion to transfer, it is not properly before us now and we do not consider it. *General Portland Cement Co. v. Perry, 7 Cir., 204 F.2d 316.*'

Judge Igoe, as part of his second denial, filed the following memorandum:

[**20] 'In compliance with the mandate of the Circuit Court of Appeals in *Chicago, Rock Island and Pacific Railroad Company v. Igoe, 7 Cir., 212 F.2d 378,* the order heretofore entered in this matter denying the transfer of the above cause has been vacated and further consideration has been given to the petition for transfer heretofore filed herein, as well as to all of the pleadings in this matter, including 1292 *19 affidavits filed by both parties thereto since the cause has been remanded.

'Upon consideration of all of the papers now on file in this case, I have reached the conclusion that it would not be for the convenience of the parties and witnesses,

nor in the interest of justice to transfer this case to either of the Iowa Districts requested in the petition of the defendant.'

I also think the District Judge is entitled to have repeated the following representation made in his answer, and behalf, by his counsel:

'Respondent further states that he has faithfully discharged the discretion which the orderly administration of justice requires.'

Now, the majority devotes part of their opinion to what 'we intended to say' and 'thought we clearly delineated * * *' [**21] in *Chicago, R.I. & P.R. Co. v. Igoe, 7 Cir., 1954, 212 F.2d 378.* Yet I find it difficult to so easily dilute the impact of Judge Lindley's final passage:

'Ultimate decision on that motion is within the province of the District Court, and we cannot, as petitioner would have us do, usurp its function and decide the question in this court.' Ibid, 382.

The Railroad's first petition for mandamus, then pending before the panel which approved 1292 *20 that specific closing paragraph, sought precisely the same relief now granted, after petitioner's persistent efforts. Having announced we had 'power,' the writ was neither expressly granted nor denied. Facing up to realities, it seems to me the trial judge was simply given a second chance. Since he made the wrong choice on the second round, which incidently was the same ruling precipitating remand, the writ issues.

Discretion, vested in the District Judge is the nub of this matter. Secret motives of either set of litigants, or their counsel are irrelevant -- the trial judge stands alone. For that reason I disclaim the majority's statement, i.e., '* * * we feel there is no inconsistency between this opinion and [**22] our previous opinion in this case.' It is hardly sound justification for currently usurping the District Judge's function and deciding the question in this court, to say we were, at first, concerned solely with enunciating the existence of our 'power.' Regardless of how it is articulated, I think we now usurp, where once we refrained. Either the remand order gave the District Judge a Hobson's choice, or it left him with discretion. Nor can the inconsistency be dispelled 1292 *21 by simply pointing up a sentence lurking in the first opinion, *212 F.2d 378, 381,* viz.: 'However, this opinion deals with the existence of power only, not with the permissible limitations on its exercise.' For I find it difficult to conclude that the following portion of [*307] Judge Lindley's opinion is merely dictum, if 'power' was the sole decision point:

'We adhere to the Dairy Industries decision and remand the cause to the District Court with directions to

vacate the order denying the transfer and to reconsider petitioner's motion in the light of the views expressed herein.' *212 F.2d 378, 382*.

The 'views' concerned *§ 1404(a)*; and the District Judge reconsidered. [**23] Nowhere in its opinion has the majority shown why the writ did not issue the first time. I hardly think remand was ordered as a veiled threat predicated upon an announcement that we had power to issue the writ.

I think we should come to grips with the core issue -- abuse of discretion, its existence or non-existence. If we are substituting our discretion for that of respondent we ought to say so and be done with it. We have no business, as I view it, balancing conveniences of the parties, and speculating 1292 *22 upon their motivations.

Just how 'society in general' merits consideration on a motion to transfer escapes me. That the words found in *§ 1404(a)* "in the interest of justice', must be given paramount consideration' is an unsupported view of a district court speaking in *Greve v. Gibraltar Enterprises, Inc., D.C.D.N.M.1949, 85 F.Supp. 410, 413*. But if that epitomizes *§ 1404(a)* then certainly it is a sweeping and elastic criteria. Respondent had a broad range of discretion under that prong of *§ 1404(a)*, even in light of the majority's reasoning.

What chiefly emerges from the repertory of ideas expressed in the majority's opinion is not a demonstration [**24] of discretion abused below, but rather a sliding scale of judgment values between reviewing tribunal and trial court.

My additional views coincide with those expressed by Judge Goodrich, speaking for a unanimous court in

All *States Freight v. Modarelli, 3 Cir., 1952, 196 F.2d 1010, 1011-1012*:

'The second danger which threatens the usefulness of *Section 1404(a)* comes from the appellate courts. It is settled in this Circuit and elsewhere that an order either making a transfer or refusing a transfer is not appealable. Now the effort 1292 *23 is being made both in this court and elsewhere to substitute for appeal a review by mandamus whenever the losing party on a motion to transfer wants an advance review of the ruling on this point.

'We think that this practice will defeat the object of the statute. Instead of making the business of the courts easier, quicker and less expensive, we now have the merits of the litigation postponed while appellate courts review the question where a case may be tried.

'Every litigant against whom the transfer issue is decided naturally thinks the judge was wrong. It is likely that in some cases an appellate court would think so, [**25] too. But the risk of a party being injured either by the granting or refusal of a transfer order is, we think, much less than the certainty of harm through delay and additional expense if these orders are to be subjected to interlocutory review by mandamus.

'We do not propose to grant such review where the judge in the district court has considered the interests stipulated in the statute and decided thereon. * * *'

Our mandamus power is not a muscle which requires exercise to maintain its vitality. More slides into abdication, today, than a mere order of transfer 1292 *24 finally wrested from our court.

LEXSEE 496 F.3d 773, 777

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant, v.
CONCENTRA HEALTH SERVICES, INCORPORATED, Defendant-Appellee.**

No. 06-3436

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*496 F.3d 773; 2007 U.S. App. LEXIS 18487; 101 Fair Empl. Prac. Cas. (BNA) 212; 90
Empl. Prac. Dec. (CCH) P42,917*

**May 25, 2007, Argued
August 3, 2007, Decided**

**PRIOR HISTORY:** [**1]
   Appeal from the United States District Court for the
Northen District of Illinois, Eastern Division. No. 05 C
1109. Wayne R. Andersen, Judge.
*EEOC v. Concentra Health Servs., 2006 U.S. Dist. LEX-
IS 67125 (N.D. Ill., July 12, 2006)*

**COUNSEL:** For EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION, Plaintiff - Appellant: Joseph
A. Seiner, EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Washington, DC USA.

For CONCENTRA HEALTH SERVICES, INCORPO-
RATED, Defendant - Appellee: James J. Oh, LITTLER
MENDELSON, Chicago, IL USA.

**JUDGES:** Before BAUER, CUDAHY and FLAUM,
Circuit Judges.

**OPINION BY:** CUDAHY; FLAUM

**OPINION**

   [*775] CUDAHY, *Circuit Judge.* Charles Horn
complained to the Equal Employment Opportunity
Commission that his employer, Concentra Health Ser-
vices, Inc., fired him when he reported a sexual affair
between his supervisor and another employee. The
EEOC brought an action against Concentra, arguing that
Concentra had violated the anti-retaliation provision of
Title VII of the Civil Rights Act of 1964. The district
court dismissed the EEOC's complaint without prejudice,
holding that the anti-retaliation provision did not protect
Horn's report. The EEOC responded by filing a markedly
less detailed amended complaint that did not allege the
specifics of Horn's report. The district court dismissed
the amended complaint with prejudice. The EEOC ap-
peals [**2] and we affirm, holding that the amended

complaint failed to provide Concentra with sufficient
notice of the nature of the EEOC's claim.

**I. Background**

   In 2003, Charles Horn filed a charge of discrimina-
tion with the Equal Employment Opportunity Commis-
sion (EEOC). In it he alleged that, while working as an
Assistant Center Administrator for Concentra Health
Services, Inc. (Concentra) in August 2001, he discovered
that his supervisor and another employee were having a
sexual affair. In April 2002 Horn further learned that the
supervisor was giving the employee preferential treat-
ment because of this relationship. The charge stated that
on April 25, 2002, Horn reported the situation to Con-
centra's brass. Concentra allegedly responded by, among
other things, firing Horn on a pretext.

   The EEOC investigated Horn's charge and sued
Concentra under Title VII of the Civil Rights Act of
1964, using its power to "bring a civil action against any
respondent . . . named in the charge." *42 U.S.C. §
2000e-5(f)(1).* Its terse complaint alleged that Concentra
had retaliated against Horn because he "opposed [a]
practice made an unlawful employment practice" by Title
VII, in violation of *42 U.S.C. § 2000e-3(a).* [**3] The
complaint also laid out the broad details alleged in Horn's
charge: Horn reported to Concentra's Director of Human
Resources that "his female supervisor gave a male sub-
ordinate, with whom she was having an inappropriate
sexual relationship, preferential treatment over similarly
situated employees with respect to his employment," and
Concentra responded by firing Horn. (Compl. P 7.)

   The district court granted Concentra's motion to
dismiss the complaint for failure to state a claim upon
which relief can be granted. It reasoned that employees
are protected against retaliation only when they reasona-
bly believe that the activities they oppose violate Title
VII, *see Clark County Sch. Dist. v. Breeden, 532 U.S.*

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

268, 269-71, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000), and that it was clear at the time Horn reported the affair that favoring a subordinate because of a sexual relationship did not, without more, violate Title VII, *see Preston v. Wis. Health Fund*, 397 F.3d 539, 541 (7th Cir. 2005); *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002). The court concluded that, assuming Horn had believed that [**4] the affair violated Title VII, [*776] his belief was not reasonable, and that the EEOC's complaint therefore did not state a claim of illegal retaliation. *EEOC v. Concentra Health Servs., Inc.*, No. 05 C 1109, 2005 U.S. Dist. LEXIS 26926, 2005 WL 2989904, *2 (N.D. Ill. Nov. 3, 2005).

The dismissal was without prejudice and rather than stand on its complaint and challenge the district court's interpretation of Title VII, the EEOC chose to file an amended complaint that is the subject of this appeal. It differs from the original in only one respect: the seventh paragraph, which sets forth the EEOC's claim, is conspicuously less detailed and specific.

> Since at least 2001, Defendant has engaged in unlawful employment practices at its Elk Grove location, in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). Such unlawful employment practices include, but are not limited to, retaliating against Horn after he opposed conduct in the workplace that he objectively and reasonably believed in good faith violated Title VII by reporting the conduct to Concentra's Director of Human Resources. Concentra's retaliation includes, but is not limited to, issuing Horn unwarranted negative evaluations and terminating him.

(Am. Compl. [**5] P 7.) Thus, the amended complaint does not specify the nature of the conduct Horn reported to the Human Resources Director other than to indicate that Horn reasonably believed that it violated Title VII.

Concentra again moved to dismiss. The district court, noting that the "amended complaint is even more vague than the original," *EEOC v. Concentra Health Servs., Inc.*, No. 05 C 1109, 2006 U.S. Dist. LEXIS 67125, 2006 WL 2024240, *1 (N.D. Ill. July 12, 2006), granted the motion with prejudice, offering two alternative and radically different (indeed logically inconsistent) bases for its decision. First, it concluded that the complaint did not provide sufficient notice of the nature of the EEOC's claim "because it offers only a conclusory

allegation rather than offering any facts to support the claim," and more specifically because it does not "specify what conduct Horn believed to violate Title VII." *2006 U.S. Dist. LEXIS 67125 at *6*. Second, it concluded that Horn's EEOC charge is "central to [the EEOC's] claim" (in that a charge is a statutory prerequisite to the EEOC's suit) and consequently should be considered part of the complaint, even though it was not physically attached to the complaint. *2006 U.S. Dist. LEXIS 67125 at *3*. The court reasoned that because [**6] the amended complaint refers to the charge, the EEOC must adopt all of the charge's allegations and plead itself out of court again. *2006 U.S. Dist. LEXIS 67125 at *4-7*. The EEOC now appeals.

## II. Discussion

*Rule 12(b)(6)* permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The Supreme Court has interpreted that language to impose two easy-to-clear hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) (alteration in *Bell Atlantic*). Second, its allegations must plausibly suggest that the defendant has a right to relief, raising that possibility above a "speculative level"; if they do not, the plaintiff pleads itself out of court. *Bell Atlantic*, 127 S. Ct. at 1965, 1973 n.14. Concentra argues in the alternative that the EEOC's complaint [*777] has failed to meet either of [**7] these requirements; we discuss the latter first.

### A. Did the EEOC Plead Itself Out of Court?

One reason Concentra offers for affirming the dismissal of the EEOC's amended complaint is that the EEOC has pleaded itself out of court by alleging that Horn reported his supervisor's favoritism to a lover. This argument reflects a fond nostalgia for the EEOC's original complaint, which alleged those facts and was dismissed because the allegations neither constituted a violation of Title VII nor "suggest[ed]" such a violation. *EEOC v. Concentra Health Servs., Inc.*, 2006 U.S. Dist. LEXIS 67125, 2006 WL 2024240, *5 (N.D. Ill. July 12, 2006). That original dismissal was probably correct. True, while the original complaint stressed the rejected "favoring a paramour" theory, it did not logically foreclose the possibility that some other aspect of Horn's report might have furnished a ground for relief. Perhaps, as Concentra now suggests, the reported affair was not

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

consensual but rather the result of quid-pro-quo sexual harassment. Some of our cases suggest that such a possibility is enough to avoid dismissal. *See, e.g., Kolupa v. Roselle Park Dist., 438 F.3d 713, 715 (7th Cir. 2006)* (stating that dismissal is proper only "when [**8] it would be necessary to contradict the complaint in order to prevail on the merits").

Those cases, however, are no longer valid in light of the Supreme Court's recent rejection of the famous remark in *Conley v. Gibson* from which they derive, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic, 127 S. Ct. at 1968 (quoting Conley v. Gibson, 355 U.S. at 45-46)*. As the *Bell Atlantic* Court explained, it is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief, *id. at 1968-69*, by providing allegations that "raise a right to relief above the speculative level," *id. at 1965*. Horn's report of a sexual affair is logically consistent with the possibility that the affair was caused by quid-pro-quo sexual harassment, but it does not *suggest* that possibility any more than money changing hands suggests robbery. Dismissal was probably correct.

But enough of this trip down memory lane; why are allegations contained in the original complaint relevant [**9] to this appeal? The original complaint was dismissed and the EEOC does not seek to resurrect it. The amended complaint does not contain the specifics of Horn's report, which the EEOC undoubtedly excluded precisely to avoid pleading itself out of court. Concentra does not contend that the bare allegations of the amended complaint's seventh paragraph fail to plausibly suggest a right to relief.[1] Neither does it [*778] argue that the EEOC is still bound by the allegations of its original complaint, which it is not. *188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 736 (7th Cir. 2002); Nisbet v. Van Tuyl, 224 F.2d 66, 71 (7th Cir. 1958)*.

[1] Concentra probably avoids this contention with good reason. That Concentra might retaliate against Horn for a report protected by Title VII seems no less plausible than that a prison doctor might improperly withhold desperately needed medication, see *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)* (per curiam), or that a driver might negligently strike a pedestrian, *see* Fed. R. Civ. P. Form 9; *see also Fed. R. Civ. P. 44* (stating that the forms "are sufficient under the rules"). *Bell Atlantic* itself does not appear to suggest that the *bare idea* of an antitrust [**10] conspiracy among major telephone companies like the one alleged in that case

is implausible; rather, it appears to hold that the plaintiffs pleaded themselves out of court with detailed "allegations of parallel conduct" that did not plausibly suggest such a conspiracy. *Bell Atlantic, 127 S. Ct. at 1963, 1966*. The Court did not decide whether the complaint would have been dismissed "had [it] not explained that the claim of agreement rested on the parallel conduct described." *Id. at 1970 n.10*. The Court suggested that it might have been dismissed, but because it "would [not] have given the notice required by *Rule 8*," not because its allegations would have been implausible. *Id.; see also id. at 1966 & n.5* (stressing that adequate notice and plausibility are two distinct, parallel requirements).

Concentra does argue that the EEOC is bound by Horn's EEOC charge. The EEOC did not attach the charge to its complaint, which would have made the charge part of the pleadings under *Fed. R. Civ. P. 10(c)*, but Concentra relies on a "narrow exception" to *Rule 10(c)* holding that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's [**11] complaint and are central to his claim." *Cont'l Cas. Co. v. Am. Nat'l Ins. Co., 417 F.3d 727, 731 n.3 (7th Cir. 2005); 188 LLC, 300 F.3d at 735*. The amended complaint refers to the charge because it satisfies a statutory prerequisite to the EEOC's suit, since the EEOC can sue only a "respondent . . . named in [a] charge," *42 U.S.C. § 2000e-5(f)(1)*, and Concentra contends that the charge is "central" to the EEOC's claim for that same reason. Because the charge contains allegations similar to those of the original complaint, Concentra concludes, the EEOC has foolishly pleaded itself out of court again, despite its plain desire to avoid doing just that.

Concentra's argument does not work because while the defendant the EEOC sues must be named as a respondent in a charge, the facts it seeks to prove need not be listed there. The charge triggers the investigation, but "if the investigation turns up additional violations, the [EEOC] can add them to its suit"; there is no need for the EEOC's complaint to be "closely related to the charge." *EEOC v. Caterpillar, Inc., 409 F.3d 831, 833 (7th Cir. 2005)*. Given that flexibility, the charge need not be "central" to the complaint, and consequently [**12] need not be considered part of it. *See Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998)* ("[T]his is a narrow exception aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment.").

Moreover, even if the EEOC had attached the charge to its amended complaint, it would have adopted its allegations only if it relied on the charge to form the basis of

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

its claims. *Carroll v. Yates, 362 F.3d 984, 986 (7th Cir. 2004); N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 455-56 (7th Cir. 1998).* Plaintiffs often attach documents to complaints for other reasons entirely. For instance, a plaintiff challenging an administrative action might attach a copy of the administrator's decision to its complaint in order to illustrate the action it attacks, but it would not by doing so adopt all of the administrator's assertions as its own (indeed, quite the contrary). *Carroll, 362 F.3d at 986.* In the present case, the EEOC similarly referred to Horn's charge not to catalogue the facts it hoped to prove at trial, but only to show that "[a]ll conditions precedent [**13] to the institution of this lawsuit have been fulfilled," in other words, that a charge naming Concentra as respondent had been filed. (Am. Compl. P 6.) The EEOC's considerate decision to include this fact in its complaint did not compel it to adopt the charge's statements [*779] as its own and thereby plead itself out of court.

**B. Did the EEOC Provide Fair Notice of Its Claims?**

This leaves the second ground on which Concentra urges us to affirm the dismissal of the complaint: that it fails to specify the conduct that Horn reported to the Director of Human Resources (except, of course, to say that Horn reasonably believed it violated Title VII). *Rule 8(a)(2)*'s "short and plain statement of the claim" must contain a minimal level of factual detail, although that level is indeed very minimal. *See Bell Atlantic, 127 S. Ct. at 1964-65 & n.3 (2007).* The classic verbal formula is that a complaint need only be sufficiently detailed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))* (alteration in *Bell Atlantic*); *Cler v. Ill. Educ. Ass'n, 423 F.3d 726, 729 (7th Cir. 2005).* [2] This formula captures [**14] a mood of liberal pleading that is enough to settle the sufficiency of most federal complaints, but "it isn't anything that we can use with any precision." Charles E. Clark, *Pleading Under the Federal Rules,* 12 Wyo. L.J. 177, 181 (1957-1958). [3] "[T]o determine exactly what is 'enough'" in a rare close case, a court must attend closely to the purpose of the federal pleading rules and the guidance offered by prior decisions. *McCormick v. City of Chicago, 230 F.3d 319, 323-26 (7th Cir. 2000).*

---

2    We have sometimes used other formulas, stating, for instance, that complaints must give defendants "a reasonable opportunity to form an answer," *Pratt v. Tarr, 464 F.3d 730, 732 (7th Cir. 2006),* and enable defendants to "begin to prepare their defense," *id. at 733.*

3    Requiring an opportunity to form an answer or to begin to prepare a defense might sound

more like an easy-to-apply yardstick until one realizes that neither standard can be taken literally. *Rule 8(b)* would permit any defendant to answer even the most vacuous and vague complaints truthfully and without prejudice to its defense by answering that it is "without knowledge or information sufficient to form a belief as to the truth of [its] [**15] averments," rendering *Rule 8(a)(2)* empty. Similarly, a defendant can always begin to investigate and prepare a defense by serving a contention interrogatory on the plaintiff in discovery. *Pratt v. Tarr, 464 F.3d 730, 733 (7th Cir. 2006); Ryan v. Mary Immaculate Queen Ctr., 188 F.3d 857, 860 (7th Cir. 1999).* What our cases require, however, is that a defendant know some quantum of information about the plaintiff's claim before discovery starts. The question that must be resolved in close cases is how much information is required.

As the EEOC asserts, "[t]he intent of the liberal notice pleading system is to ensure that claims are determined on their merits rather than through missteps in pleading." 2 James W. Moore, et al., *Moore's Federal Practice § 8.04* (3d ed. 2006); *see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Conner v. Ill. Dep't of Natural Res., 413 F.3d 675, 679 (7th Cir. 2005).* Requiring a plaintiff to plead detailed facts interferes with that goal in multiple ways. First, and most importantly, the number of factual details potentially relevant to any case is astronomical, and requiring a plaintiff to plead facts that are not obviously important and easy to [**16] catalogue would result in "needless controversies" about what is required that could serve only to delay or prevent trial. Charles E. Clark, *Special Pleading in the "Big Case," 21 F.R.D. 45, 53 (1957); see also Luckett v. Rent-A-Center, Inc., 53 F.3d 871, 873 (7th Cir. 1995)* (warning that "the pleading stage is not the occasion for technicalities"). Most details are more efficiently learned through the flexible discovery process. *Swierkiewicz, 534 U.S. at [*780] 512-13; Walker v. Benjamin, 293 F.3d 1030, 1039 (7th Cir. 2002).* "Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving." *Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998); see also Dioguardi v. Durning, 139 F.2d 774, 775 (2d Cir. 1944)* (describing the attempts to force all facts into the complaint as "judicial haste which in the long run makes waste"). Second, a plaintiff might sometimes have a right to relief without knowing every factual detail supporting its right; requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim. *Am. Nurses' Ass'n v. State of Illinois, 783 F.2d 716, 723 (7th Cir. 1986); [**17] Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago, 747*

Page 5

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

*F.2d 384, 404 (7th Cir. 1984), aff'd, 473 U.S. 606, 105 S. Ct. 3291, 87 L. Ed. 2d 437 (1985).*

But a pleading standard designed to protect litigants and their lawyers from needless, counterproductive technicality is less convincingly invoked by a government agency seeking to simply step around a more informative complaint that has been dismissed for failure to state a claim. The rules do not require unnecessary detail, but neither do they promote vagueness or reward deliberate obfuscation. Judge Charles Clark, the reporter of the committee that drafted *Rule 8*, once described the need for common sense in pleading standards, asking rhetorically why the federal rules did not eliminate pleadings entirely:

> Why not go to the other extreme and say, "I want you to answer in a tort action," or something like that? Well, I think the answer is quite simply that we want to get what we can easily get that will be helpful. We want the lawyers to "do what comes naturally." . . . [W]hat serves as a good form of communication among lawyers is desirable here.

Charles E. Clark, *Pleading Under the Federal Rules,* 12 Wyo. L.J. 177, 183 (1957-1958). Encouraging a plaintiff to plead what [**18] few facts can be easily provided and will clearly be helpful serves to expedite resolution by quickly alerting the defendant to basic, critical factual allegations (that is, by providing "fair notice" of the plaintiff's claim) and, if appropriate, permitting a quick test of the legal sufficiency of those allegations. *Conner, 413 F.3d at 679; Ryan v. Mary Immaculate Queen Ctr., 188 F.3d 857, 860 (7th Cir. 1999).*

In the present case the EEOC's lawyers failed to persuade the district court that the facts it originally pleaded stated a claim, so it deleted enough information to disguise the nature of its claim before the court. This gambit is not necessarily fatal to a claimant, but such obfuscation certainly does not intuitively comport with the purposes of notice pleading. A complaint should contain information that one *can* provide and that is clearly important; the EEOC has removed information that it *did* provide and that showed that its prior allegations did not state a claim. The one redeeming possibility is that the original complaint contained detail that was not easily provided or obviously helpful. In general that is not an unlikely possibility; federal complaints are more often [**19] than not prolix far beyond anything *Rule 8* requires. *Jackson v. Marion County, 66 F.3d 151, 154 (7th Cir. 1995); Am. Nurses' Ass'n, 783 F.2d at 723-24.* But in the present case the EEOC's original complaint was a model of economy. The claim itself was set forth in less than a page and the critical details were contained in a single eight-line paragraph, the very paragraph targeted for excision in the amended complaint. There was no fat to trim. The EEOC should have been seriously concerned [*781] that its amended complaint sliced away the very meat of its claim.

Precedent confirms that a plaintiff like the EEOC alleging illegal retaliation on account of protected conduct must provide some specific description of that conduct beyond the mere fact that it is protected. *Kyle v. Morton High Sch., 144 F.3d 448, 454 (7th Cir. 1998).* In *Kyle,* a public schoolteacher alleged that he was fired because of his otherwise unspecified "political and advocacy or perceived political and advocacy activities." The district court dismissed and we affirmed, holding that "the complaint for a *First Amendment* violation must at least put the defendants on notice that some specific speech or conduct by the plaintiff [**20] led to the termination." *Id. at 454.* Providing such detail was "not a particularly cumbersome assignment," *id. at 454,* and the information was of obvious critical importance to Kyle's case. It might turn out that the speech Kyle *thought* was protected by the *First Amendment* was in fact not, a possibility that could be quickly tested if Kyle were to specify the speech in greater detail. *Id. at 455.* Kyle's reticence also frustrated "the defendants' ability to even investigate [his] claim . . . . For example, the Morton School Board cannot ask its board members if they were aware of the speech, conduct or political association engaged in by Kyle--because none is alleged." *Id. at 455.*

Like the *Kyle* complaint, the EEOC's amended complaint fails to provide the notice required by *Rule 8(a)(2);* it must further specify the "conduct in the workplace" that Horn reported. This is, if anything, a less "cumbersome requirement" than Kyle faced; surely Horn must remember in some detail what he said to the Human Resources Director and must have relayed that information to the EEOC during its investigation. (Of course, as the EEOC cagily observed at oral argument, there is nothing in the complaint itself [**21] to indicate the full extent of what Horn told it, but the EEOC cannot avoid a requirement to provide limited detail simply by failing to provide it and suggesting--not even asserting!--that it cannot do so.)

Further, although the EEOC's amended complaint may not be *quite* as vague as the *Kyle* complaint (it alleges the title of the Concentra official to whom Horn reported the Title VII violation, which at least gives Concentra a place to start investigating what Horn might have said), additional details of Horn's actions are critically important to the case and might facilitate a quick resolution on the merits. Just as Kyle might have misconstrued the scope of *First Amendment* protection, so

Case 1:08-cv-01985    Document 10-5    Filed 06/09/2008    Page 25 of 58

Page 6

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

the EEOC and Horn may have misconstrued the scope of Title VII. *See, e.g., Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 224 F.3d 701, 704-07 (7th Cir. 2000) (describing a plaintiff that mistakenly thought Title VII prohibited discrimination on account of sexual orientation). Even a description in very general terms ("Horn complained that Concentra denied employees promotions because of their race," "Horn complained that Concentra supervisors were subjecting female employees to a hostile work [**22] environment," or some similar phrase) would give Concentra a much clearer idea of the EEOC's claim.

We have stated that a plaintiff alleging employment discrimination on the basis of race, sex or some other factor governed by *42 U.S.C. § 2000e-2* may allege the defendant's intent quite generally: "'I was turned down for a job because of my race' is all a complaint has to say." *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir. 1998); *see also Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 714 (7th Cir. 2006) (holding that a religious discrimination plaintiff need only say that the employer "h[eld] the worker's religion against him"). [*782] The EEOC argues that its present complaint is just as informative as these. But we are unaware of any court that has approved a retaliation complaint as stripped-down as the EEOC's; one court has merely suggested, in dicta, that it might. *See Rochon v. Gonzales,* 370 U.S. App. D.C. 74, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (suggesting that a Title VII retaliation plaintiff need only allege that the defendant "retaliated against me because I engaged in protected activity"). It is rarely proper to draw analogies between complaints alleging different sorts of claims; the type of facts that [**23] must be alleged depend upon the legal contours of the claim. *Pratt v. Tarr,* 464 F.3d 730, 732 (7th Cir. 2006); Charles E. Clark, *The Complaint in Code Pleading,* 35 Yale L.J. 259, 265 (1926). *See also Marshall v. Knight,* 445 F.3d 965, 968 (7th Cir. 2006) ("The requirement that prisoners making access-to-courts claims allege specific prejudice should not be understood as an onerous fact-pleading burden; it is simply a requirement that a prisoner's complaint spell out, in minimal detail, the connection between the alleged denial of access to legal materials and an inability to pursue a legitimate challenge to a conviction."); *Loubser v. Thacker,* 440 F.3d 439, 442-43 (7th Cir. 2006) ("Although conspiracy is not something that *Rule 9(b)* . . . requires be proved with particularity . . . it differs from other claims in having a degree of vagueness that makes a bare claim of 'conspiracy' wholly uninformative to the defendant.").

The simple allegation of racial discrimination described in *Bennett* is factually richer than the empty assertion of Title VII retaliation here. People have reasonably clear ideas of how a racially biased person might behave, and a defendant responding to an allegation [**24] of racial bias can anticipate the sort of evidence that may be brought to bear and can investigate the claim (by inquiring if any decision-making employees have a background of making racially insensitive comments and the like). An allegation of retaliation for some unspecified act does not narrow the realm of possibility nearly as much. Further, once a plaintiff alleging illegal discrimination has clarified that it is on the basis of her race, there is no further information that is both easy to provide and of clear critical importance to the claim. Requiring a more detailed complaint in *Bennett* would have replicated the inefficient chase for facts decried in *Bennett* and *Dioguardi.*

But to require a more detailed complaint in the present case is neither to adopt fact pleading nor to impose the heightened pleading required in some instances by *Rule 9(b)*; it is only to insist upon easily provided, clearly important facts. The proper analogue for the present complaint is not a complaint alleging racial discrimination in hiring; it is a complaint in which the plaintiff withholds the basis upon which she suspects her employer acted: "I was turned down for a job for a reason forbidden by [**25] Title VII." To permit the EEOC's complaint would reward obfuscation, a perverse result.

Failure to provide fair notice should not normally warrant a dismissal *with prejudice. See Redfield v. Cont'l Cas. Corp.,* 818 F.2d 596, 609-10 (7th Cir. 1987). *Rule 8(a)(2)* does not seek detail that a plaintiff cannot provide, so a plaintiff should be able to re-plead successfully. But the EEOC has not argued that the district court should have permitted a second amended complaint, [4] so we need not address that issue. We need only affirm.

[4] We have no way of knowing why the EEOC did not request further repleading, but one cannot help wondering whether the EEOC has any theory on which it hopes to succeed at trial other than the rejected "favoring the paramour" claim. The EEOC has done nothing to explain why, if it has reason to believe there were other bases for retaliation, it left those bases out of its original complaint. Under these circumstances, one can understand why Concentra angrily accuses the EEOC of "hid[ing] the ball" and playing a "shell game." (Br. of Def.-Appellee at 6.) If the EEOC is indeed playing such a game, it should be glad that its appeal has failed: discovery might have revealed [**26] evidence showing that it merited sanctions for filing a pleading intended "to harass or to cause unnecessary delay or needless increase in the cost of litigation." *Fed. R. Civ. P. 11(b)(1); see also Pepper v. Vill. of Oak Park,*

Case 1:08-cv-01985    Document 10-5    Filed 06/09/2008    Page 26 of 58

Page 7

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

*430 F.3d 805, 812 (7th Cir. 2005)* (stressing that pleadings serve "to provide notice, not to prolong a losing case beyond its natural life").

At oral argument the EEOC *did* request permission to replead in the event that the applicable pleading standards had been changed by the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Even assuming that *Bell Atlantic* changed the level of detail required by notice pleading, which seems doubtful, *see supra* note 1; *see also Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 2007 U.S. App. LEXIS 16204, 2007 WL 1969681, *3-4 (10th Cir. 2007); Roth v. Jennings, 489 F.3d 499, , 2007 WL 1629889, *29 (2d Cir. 2007); but see Iqbal v. Hasty, 490 F.3d 143, 2007 U.S. App. LEXIS 13911 *27, 2007 WL 1717803, *8-*11 (2d Cir. 2007)* (noting that *Bell Atlantic* created "[c]onsiderable uncertainty concerning the standard for assessing the adequacy of pleadings" and analyzing "conflicting [**27] signals" in the Court's opinion), we hold that the amended complaint failed to provide adequate notice under precedents that long preceded *Bell Atlantic*, so the requested relief is unnecessary.

[*783]

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

**CONCUR BY:** FLAUM

**CONCUR**

FLAUM, *Circuit Judge,* concurring. I join the majority's final conclusions that the EEOC's complaint does not meet the notice pleading standards of *Rule 8(a) of the Federal Rules of Civil Procedure* and that the EEOC did not plead itself out of court by referring to the charge in its complaint. I respectfully disagree, however, that the complaint was insufficient under our *pre-Bell Atlantic* case law. [1]

1   I also disagree with the majority's suggestion that *Bell Atlantic* dismissed the plaintiffs' suit because they pled too much detail. *See* slip op. at n.1. Rather, it appears that the Court dismissed the plaintiffs' complaint because it did not plead enough. *See Bell Atlantic, 127 S. Ct. at 1964-69* ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

In my judgment, the EEOC's complaint--which alleged that Concentra retaliated [**28] against Horn because he reported a colorable Title VII violation--was sufficient before *Bell Atlantic,* as I find it difficult to distinguish from other equally sparse pleadings that this Court previously approved. *See Kolupa v. Roselle Park Dist., 438 F.3d 713, 714 (7th Cir. 2006)* (noting that a complaint would satisfy *Rule 8(a)* if it alleged that an "employer . . . caused some concrete injury by holding the worker's religion against him"); *Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998)* (noting that a complaint would satisfy *Rule 8(a)* if it alleged "I was turned down for a job because of my race"). Moreover, other circuits have approved complaints that, for all practical purposes, are the same as the one in this case. *See Rochon v. Gonzales, 370 U.S. App. D.C. 74, 438 F.3d 1211, 1220 (D.C. Cir. 2006)* (stating that a complaint in a retaliation case need only say, "[T]he Government retaliated against me because I engaged in protected activity."); *Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006)* ("[T]o plead a retaliation claim under the *First Amendment,* a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness [**29] from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the [*784] retaliatory action."). [2]

2   In *Kyle v. Morton High School, 144 F.3d 448, 454 (7th Cir. 1998),* the pre-Bell *Atlantic* decision which the majority opinion cites approvingly, this Court held that the plaintiff's complaint did not give the defendant notice of his claim because it did not allege that the plaintiff engaged in protected speech and pled only legal conclusions without providing any supporting facts. However, in *McCormick v. City of Chicago, 230 F.3d 319, 324-25 (7th Cir. 2000),* this Court separated itself from the position that a plaintiff cannot state a claim by reciting mere legal conclusions. As a result, the *Kyle* approach was limited, at least to the extent that it required a plaintiff alleging retaliation to provide details about his protected speech.

Although I conclude that the EEOC's complaint would have been sufficient under this and other circuits' pre-Bell *Atlantic* case law, I am unable to share the majority's view that *Bell Atlantic* left our notice pleading jurisprudence intact. Indeed, as I read *Bell Atlantic,* the Supreme Court in interpreting *Rule 8(a)* [**30] required that a plaintiff plead enough facts to demonstrate a plausible claim. *Bell Atlantic, 127 S. Ct. at 1965* ("Factual allegations must be enough to raise a right to relief above the speculative level."). *Cf. Kolupa, 438 F.3d at 715* (stating that "complaints need not plead

496 F.3d 773, *; 2007 U.S. App. LEXIS 18487, **;
101 Fair Empl. Prac. Cas. (BNA) 212; 90 Empl. Prac. Dec. (CCH) P42,917

facts"). Because in my view the EEOC's complaint did not meet that threshold, I concur in the majority's decision to affirm the district court's dismissal.

LEXSEE 127 S. CT. 1955, 1968

**BELL ATLANTIC CORPORATION, et al., Petitioners v.WILLIAM TWOMBLY, et al.**

**No. 05-1126**

**SUPREME COURT OF THE UNITED STATES**

*127 S. Ct. 1955; 167 L. Ed. 2d 929; 2007 U.S. LEXIS 5901; 75 U.S.L.W. 4337; 2007-1 Trade Cas. (CCH) P75,709; 68 Fed. R. Serv. 3d (Callaghan) 661; 20 Fla. L. Weekly Fed. S 267; 41 Comm. Reg. (P & F) 567*

**November 27, 2006, Argued**
**May 21, 2007, Decided**

**NOTICE:**

[***1]  The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:**     ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
*Twombly v. Bell Atl. Corp., 425 F.3d 99, 2005 U.S. App. LEXIS 21390 (2d Cir., 2005)*

**DISPOSITION:**     Reversed and remanded.

**DECISION:**

[**929] Telephone and Internet service subscribers held to have failed to state claim against local exchange carriers for alleged parallel billing and contracting designed to discourage competition in asserted violation of § 1 of Sherman Act (*15 U.S.C.S. § 1*).

**SUMMARY:**

**Procedural posture:**  Respondent subscribers to local telephone and Internet services brought an action against petitioner local exchange carriers, alleging that the carriers engaged in parallel conduct to preclude competition in violation of § 1 of the Sherman Act, *15 U.S.C.S. § 1.*  Upon the grant of a writ of certiorari, the carriers appealed the judgment of the U.S. Court of Appeals for the Second Circuit which held that the subscribers sufficiently stated a claim.

**Overview:**  The subscribers asserted that the carriers were former local monopolies which engaged in parallel billing and contracting misconduct designed to discourage new competitors from entering their markets

through sharing of the carriers' networks.  The subscribers also alleged that the carriers agreed not to compete outside their own markets.  The U.S. Supreme Court held that the subscribers' allegations that the carriers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, were insufficient to state a claim under *§ 1* of the Sherman Act.  To state such a violation, allegations of parallel conduct were required to be placed in a factual context which raised a plausible suggestion of a preceding agreement rather than identical independent action.  Further, the subscribers' complaint did not indicate that the carriers' resistance to competitors was anything more than the natural, unilateral reaction of each carrier which was intent on keeping its regional dominance.  Also, the alleged  [**930] anti-competitive conduct of the carriers itself indicated that a carrier's attempt to compete in another carrier's market would not be profitable.

**Outcome:**  The judgment finding that the subscribers' complaint stated a claim was reversed, and the case was remanded for further proceedings.

**LAWYERS' EDITION HEADNOTES:**

[**LEdHN1]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 5

SHERMAN ACT LIABILITY

Headnote:[1]

Liability under § 1 (*15 U.S.C.S. § 1*) of the Sherman Act requires a contract, combination, or conspiracy, in restraint of trade or commerce.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

[**LEdHN2]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 5

SHERMAN ACT PROHIBITIONS

Headnote:[2]

*15 U.S.C.S. § 1* prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN3]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 14 RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 15

SHERMAN ACT -- TRADE RESTRAINTS PROHIBITED -- PARALLEL BUSINESS BEHAVIOR

Headnote:[3]

Because § 1 (*15 U.S.C.S. § 1*) of the Sherman Act does not prohibit all unreasonable restraints of trade, but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN4]

PLEADING § 130

PLEADING -- PLAIN STATEMENT

Headnote:[4]

*Fed. R. Civ. P. 8(a)(2)* requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give a defendant fair notice of what the claim is and the grounds upon which it rests. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN5]

PLEADING § 103

COMPLAINT -- MOTION TO DISMISS

Headnote:[5]

While a complaint attacked by a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to [**931] provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN6]

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 63

SHERMAN ACT -- STATING ANTITRUST CLAIM -- ILLEGAL AGREEMENT -- PARALLEL CONDUCT

Headnote:[6]

Stating a claim under § 1 (*15 U.S.C.S. § 1*) of the Sherman Act requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely. In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, courts have the benefit of the prior rulings and considered views of leading commentators that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent

action.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN7]

PLEADING § 176

PLEADING -- ANTITRUST ALLEGATIONS -- ENTITLEMENT TO RELIEF

Headnote:[7]

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement in violation of § 1 (*15 U.S.C.S. § 1*) of the Sherman Act reflects the threshold requirement of *Fed. R. Civ. P. 8(a)(2)* that a plain statement possess enough heft to show that the pleader is entitled to relief.  A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a claim under *§ 1* of the Sherman Act; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.  An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint:  it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN8]

PLEADING § 106

FAILURE TO RAISE CLAIM

Headnote:[8]

When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of [**932] time and money by the parties and the court.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN9]

PLEADING § 103

PLEADING -- SPECIFICITY

Headnote:[9]

A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN10]

PLEADING § 130

PLEADING -- CONSISTENT FACTS

Headnote:[10]

Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)

[**LEdHN11]

PLEADING § 103

DISMISSAL OF COMPLAINT

Headnote:[11]

When a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.  (Souter, J., joined by Roberts, Ch. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ.)  [**933]

SYLLABUS

The 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded.  The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834*.  It also authorized them to enter the long-distance market.  [***2]  "Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with" competitive local exchange carriers (CLECs)." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823*.

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct [***3] allegations, taken alone, do not state a claim under *§ 1*; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

*Held:*

1. Stating a *§ 1* claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 6-17

(a) Because *§ 1* prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628*, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S. Ct. 257, 98 L. [**934] Ed. 273*. While [***4] a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id., at 540-541, 540, 74 S. Ct. 257, 98 L. Ed. 273*. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.,* at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538.*

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a *§ 1* claim. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds

upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80*. [***5] While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.,* a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a *§ 1* claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects *Rule 8(a)(2)*'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A parallel conduct allegation gets the *§ 1* complaint close to stating a claim, but without further factual enhancement [***6] it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with "'a largely groundless claim'" from "'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.* It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible [**935] entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main [***7] argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley*'s statement construing *Rule 8:* "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an in-

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

complete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement [***8] among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try and avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did [***9] not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact [**936] pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

*425 F.3d 99*, reversed and remanded.

**COUNSEL:** Michael Kellogg argued the cause for petitioners.

**Thomas O. Barnett** argued the cause for the United States, as amicus curiae, by special leave of court.

**J. Douglas Richards** argued the cause for respondents.

**JUDGES:** Souter, J., delivered the opinion [***10] of the Court, in which Roberts, C. J., and Scalia, Kennedy, Thomas, Breyer, and Alito, JJ., joined. Stevens, J., filed a dissenting opinion, in which Ginsburg, J., joined, except as to Part IV.

**OPINION BY:** SOUTER

**OPINION**

[*1961] Justice **Souter** delivered the opinion of the Court.

[**LEdHR1] [1]  Liability under *§ 1* of the Sherman Act, *15 U.S.C. § 1*, requires a "contract, combination . . ., or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a *§ 1* complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade [***11] later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructure[d] local telephone markets" and "subject[ed] [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999)*. In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See *47 U.S.C. § 271*.

"Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L.*

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

*Ed. 2d 823 (2004)*, which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n 1. A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchas[ing] local telephone services at wholesale rates for resale to end users," (2) "leas[ing] elements of the [ILEC's] network 'on an unbundled basis,'" or (3) "interconnect[ing] its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra, at 371, 119 S. Ct. 721, 142 L. Ed. 2d 834* (quoting *47 U.S.C. § 251(c)* [***12] ). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra, at 410, 124 S. Ct. 872, 157 L. Ed. 2d 823*, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) [**937] three times revised its [*1962] regulations to narrow the range of network elements to be shared with the CLECs. See *Covad Communs. Co. v. FCC, 450 F.3d 528, 533-534 (CADC 2006)* (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services . . . from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs,[1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of *§ 1* of the Sherman Act, ch. 647, 26 Stat. 209, as amended, [**LEdHR2] **[2]**15 U.S.C. § 1*, which prohibits "[e]very contract, [***13] combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

> 1  The 1984 divestiture of AT&T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint P 21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.*, P 48, App. 26.

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in

parallel conduct" in their respective service areas to inhibit the growth [***14] of upstart CLECs. Complaint P 47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. *Ibid.* According to the complaint, the ILECs' "compelling common motivatio[n]" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "[h]ad any one [ILEC] not sought to prevent CLECs . . . from competing effectively . . ., the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." *Id.*, P 50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningfully [to] pursu[e]" "attractive business opportunit[ies]" in contiguous markets where they possessed "substantial competitive advantages," *id.*, PP 40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer [***15] (CEO) of the ILEC Qwest, that competing in the territory of another ILEC "'might be a good way to turn a quick dollar but that doesn't make it right,'" *id.*, P 42, App. 22.

The complaint couches its ultimate allegations this way:

> "In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within [**938] their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information [*1963] and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.*, P 51, App. 27.[2]

2   In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

> "Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of *Section 1* of the Sherman Act." Id., P 64, App. 30-31.

[***16] The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while '[c]ircumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, . . .] "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.'" *313 F. Supp. 2d 174, 179 (2003)* (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*; alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that "ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *313 F. Supp. 2d, at 179.* The District Court found plaintiffs' allegations of parallel ILEC actions to discourage competition inadequate [***17] because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id., at 183.* As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "alleg[e] facts . . . suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the

ILECs'] actions were the result of a conspiracy." *Id., at 188.*

The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal. *425 F.3d 99, 114 (2005)* (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct [***18] fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a [**939] plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Ibid.*

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, *547 U.S.    , 126 S. Ct. 2965, 165 L. Ed. 2d 949 (2006)*, and now reverse.

[*1964] II

A

[**LEdHR3] [3]   Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," *Theatre Enterprises, 346 U.S., at 540, 74 S. Ct. 257, 98 L. Ed. 273.* While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id., at 540-541, 74 S. Ct. 257, 98 L. Ed. 273.* Even "conscious [***19] parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)*; see 6 P. Areeda & H. Hovenkamp, Antitrust Law P 1433a, p 236 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act:  Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 672 (1962)

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

("[M]ere interdependence of basic price decisions is not conspiracy").

The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.*, AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss [***20] Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984);* and at the summary judgment stage a *§ 1* plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* [**940]

**B**

This case presents the antecedent question of what a plaintiff must plead in order to state a claim under *§ 1* of the Sherman Act. [**LEdHR4] [4]*Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in [***21] order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* [**LEdHR5] [5] While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (CA7 1994),* a plaintiff's obligation to provide the [*1965] "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)* (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspi-

cion [of] a legally cognizable right of action"),[3] on the assumption that all the allegations [***22] in the complaint are true (even if doubtful in fact), see, *e.g., Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Neitzke v. Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)* ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

3    The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post, at ____, 167 L. Ed. 2d, at 955* (opinion of Stevens, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (emphasis added), *Rule 8(a)(2)* still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (*Rule 8(a)* "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

[***23] In applying these general standards to a § 1 claim, we hold that [**LEdHR6] [6] stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [**941] of those facts is improbable, and "that a recovery is very remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit [*1966] of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when [***24] allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

4   Commentators have offered several examples of parallel conduct allegations that would make out a § 1 claim under this standard. See, e.g., 6 Areeda & Hovenkamp P 1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N. Y. L. S. L. Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

[**LEdHR7] [7] [***25] The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (CA1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are borderline: they might well be sufficient in conjunction with a more specific allegation--for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court [***26] is not required to accept such terms as a sufficient basis for a complaint").[5]

5   The border in DM Research was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

We alluded to the practical significance of the Rule 8 entitlement requirement in Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), when we explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with "'a largely groundless claim'" be allowed to "'take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value.'" Id., at 347, 125 S. Ct. 1627, [**942] 161 L. Ed. 2d 577 (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)). So, [**LEdHR8] [8] when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency [***27] should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting Daves v. Hawaiian Dredging Co., 114 F. Supp. 643, 645 (Haw. 1953)); see also Dura, supra, at 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577; Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F. Supp. 2d 986, 995 (ND Ill. 2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. [*1967] Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983), [**LEdHR9] [9]"a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy [***28] to proceed." See also Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (CA7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N. Y. U. L. Rev. 1887, 1898-1899 (2003) (discussing the unusually high cost of discovery in antitrust

cases); Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all [***29] subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post at ____, 167 L. Ed. 2d, at 951,* given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.,* Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638 (1989)* ("Judges can do little about impositional discovery when parties control the legal claims [**943] to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post, at ____, 167 L. Ed. 2d, at 951;* the threat of discovery expense will push cost-conscious defendants to settle even [***30] anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a § 1 claim. *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, supra, at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539;* alteration in *Dura*).[6]

6   The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be """phased"" and "limited to the existence of the alleged conspiracy and class certification." *Post, at ____, 167 L. Ed. 2d, at 963.* But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, cost-

ly, and hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not--cannot--know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638-639 (1989).*

[***31] [*1968] Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre Enterprises, Monsanto,* and *Matsushita,* and their main argument against the plausibility standard at the pleading stage is its ostensible conflict with an early statement of ours construing *Rule 8.* Justice Black's opinion for the Court in *Conley* v. *Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see *425 F.3d at 106, 114* (invoking *Conley*'s "no set [***32] of [**944] facts" language in describing the standard for dismissal).[7]

7    The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp., 248 F.2d 319 (CA2 1957)*, that facts indicating parallel conduct alone suffice to state a claim under § 1. *425 F.3d at 114* (citing *Nagler, supra, at 325*). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)*, and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*, have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

[***33] On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint [*1969] does not set forth a single fact in a context that suggests an agreement. *425 F.3d, at 106, 114*. It seems fair to say that this approach to pleading would dispense with any showing of a "'reasonably founded hope'" that a plaintiff would be able to make a case, see *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, 421 U.S., at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539*); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g., Car Carriers, 745 F.2d at 1106* ("*Conley* has never been interpreted literally" and, "[i]n practice, a complaint . . . must contain either direct or [***34] inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quota-

tion marks omitted; emphasis and omission in original); *Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1155 (CA9 1989)* (tension between *Conley*'s "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. Di Grazia, 544 F.2d 543, 546, n. 3 (CA1 1976)* ("[W]hen a plaintiff . . . supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42-43 (CA6 1988)* (quoting *O'Brien*'s analysis); Hazard, From Whom No Secrets Are Hid, *76 Tex. L. Rev. 1665, 1685 (1998)* (describing *Conley* as having "turned *Rule 8* on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, *86 Colum. L. Rev. 433, 463-465 (1986)* (noting tension between [***35] *Conley* and subsequent understandings of *Rule 8*).

We could go on, but there is no need to pile up further citations to show that *Conley*'s "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for [**945] relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: [**LEdHR10] [10]once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan, 40 F.3d at 251* (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*; *National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994)*; [***36] *H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249-250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*; *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.[8]

8    Because *Conley*'s "'no set of facts'" language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court and others. *Post, at ___, 167 L. Ed. 2d, at 953.*

Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley*. See *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)*; (requiring "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support the claim (alteration in *Dura*)); *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Wilson v. Schnettler, 365 U.S. 381, 383, 81 S. Ct. 632, 5 L. Ed. 2d 620 (1961)* ("In the absence of . . . an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed . . . a narcotics offense"). Nor are we reaching out to decide this issue in a case where the matter was not raised by the parties, see *post, at ____, 167 L. Ed. 2d, at 955*, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley*'s "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as *Amicus Curiae* 22-25; see also Brief for Respondents 17 (describing "[p]etitioners and their amici" as mounting an "attack on *Conley*'s 'no set of facts' standard"). The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to Conley's "no set of facts" language. *See post, at ____ - ____, 167 L. Ed. 2d, at 955-957*. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, e.g., *Leimer v. State Mut. Life Assur. Co., 108 F.2d 302, 305 (CA8 1940)* ("'[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted'"); *Continental Collieries, Inc. v. Shober, 130 F.2d 631, 635 (CA3 1942)* ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for

the unobjectionable proposition that, [**LEdHR11] [11] when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

[**946]

[***37]   [*1970] III

When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra, at ____, 167 L. Ed. 2d, at 937-938.* Although in form a few stray statements speak directly of agreement,[9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another." Complaint P 51, App. 27.[10] The nub of the [*1971] complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out [***38] and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience.[11]

9   See Complaint PP 51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).
10   If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by Rule 8. Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present," *id.*, P 64, App.

30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post, at ____, 167 L. Ed. 2d, at 953.* Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

[***39]

11    The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See *313 F. Supp. 2d 174, 182 (SDNY 2003); 425 F.3d 99, 102-104 (CA 2005).*

We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at [**947] wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 [***40] Act in all the ways the plaintiffs allege, see *id.,* P 47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.,* P 50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act; as the District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." *313 F. Supp. 2d, at 184;* cf. *Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250, 256 (SDNY 1995)* (while the [***41] plaintiff "may believe the defendants conspired . . ., the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy").[12]

12    From the allegation that the ILECs belong to various trade associations, see Complaint P 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post, at ____, - ____, 167 L. Ed. 2d, at 962, 963-964.* If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

[*1972] Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was [***42] supposedly passed in the "'hop[e] that the large incumbent local monopoly companies . . . might attack their neighbors' service areas, as they are the best situated to do so.'" Complaint P 38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p 12 (Feb. 2000). Contrary to hope, the ILECs declined "'to enter each other's service territories in any significant way,'" Complaint P 38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.,* P 40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

agreement, [***43] but here we have an obvious alternative [**948] explanation. In the decade preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. See *Verizon Communs., Inc. v. FCC, 535 U.S. 467, 477-478, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002)* (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunit[ies]" by declining to compete as CLECs against other ILECs, Complaint P 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period,[13] and [*1973] the complaint is replete with indications that any CLEC faced [***44] nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.*, P 47; App. 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp P 307d, at 155 (Supp. 2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim.[14]

13    The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it "'might be a good way to turn a quick dollar.'" P 42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See *Fed. Rule Evid. 201*. Notebaert was also quoted as saying that entering new markets as a

CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just . . . nuts." Chicago Tribune, Oct. 31, 2002, Business Section, p 1 (cited at Complaint P 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p 2 (cited at Complaint P 45, App. 23).

[***45]

14    In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of *Federal Rule of Civil Procedure 9*, which can only be accomplished "'by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)).* On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than *Rule 8* requires. *Fed. Rules Civ. Proc. 9(b)-(c).* Here, our concern is not that the allegations in the complaint were insufficiently "particular[ized]", *ibid.*; rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992,* [**949] *152 L. Ed. 2d 1 (2002)*, which held that "a complaint in an employment discrimination [***46] lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1*, "transpos[ing] 'plus factor' summary judgment analysis woodenly into a rigid *Rule 12(b)(6)* pleading standard . . . would be unwise," Brief for Respondents 39. As the District Court correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *313 F. Supp. 2d, at 181* (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his ter-

mination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed [***47] his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1.* We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond [*1974] those necessary to state his claim and the grounds showing entitlement to relief. *Id., at 508, 122 S. Ct. 992, 152 L. Ed. 2d 1.*

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

*       *       *

The judgment of the Court of Appeals for the Second Circuit is reversed, and the cause is remanded for further proceedings consistent with this opinion.

It is so ordered.

**DISSENT BY: STEVENS**

**DISSENT**

Justice **Stevens**, with whom Justice **Ginsburg** joins except as to Part IV, dissenting.

In the first paragraph of its 24-page opinion the Court states that the question to be [***48] decided is whether allegations that "major telecommunications providers engaged in certain parallel conduct unfavorable to competition" suffice to state a violation of *§ 1* of the Sherman Act. *Ante, at ____, 167 L. Ed. 2d, at 936.* The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*, would adequately resolve [**950] this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id., at 540-542, 74 S. Ct. 257, 98 L. Ed. 273.*

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, how-

ever, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. Plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge is not "plausible" provide a legally acceptable reason [***49] for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P 51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have refused to permit nonincumbent competitors to access their networks. The complaint quotes Richard Notebaert, the former CEO of one such ILEC, as saying that competing in a neighboring ILEC's territory "might be a good way to turn a quick dollar but that doesn't make it right." *Id.,* P 42, App. 22. Moreover, respondents allege that petitioners "communicate [***50] amongst themselves" through numerous industry associations. *Id.,* P 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* violation of the Sherman Act. See Report [*1975] of the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises*, a judge ruling on a defendant's motion to dismiss a complaint, "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002);* see *Overstreet v. North Shore Corp., 318 U.S. 125, 127, 63 S. Ct. 494, 87 L. Ed. 656 (1943).* But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of

sworn depositions or other limited discovery--and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement--the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that [***51] "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway," *ante, at ____, 167 L. Ed. 2d, at 947;* that "there was just no *need* for joint encouragement [**951] to resist the 1996 Act," *ante, at ____, 167 L. Ed. 2d, at 947;* and that the "natural explanation for the non-competition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante, at ____, 167 L. Ed. 2d, at 948.*

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante, at ____, 167 L. Ed. 2d, at 946;* it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural [***52] law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decision-making. More importantly, they do not justify an interpretation of *Federal Rule of Civil Procedure 12(b)(6)* that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

*Rule 8(a)(2)* of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule did not come about by happenstance and its lan-

guage is not inadvertent. The English experience with Byzantine special pleading rules [***53] --illustrated by the hypertechnical Hilary rules of 1834[1] -- made obvious [*1976] the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N. Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

1    See 9 W. Holdsworth, History of English Law 324-327 (1926).

[***54] [**952] A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

"it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform:    Drafting Pleading Rules, 57 Colum. L. Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L. Rev. 416, 417 (1921) (hereinafter Cook) ("[T]here is no logical distinction between statements which are grouped by the courts under the phrases 'statements of fact' and 'conclusions of law'"). *Rule 8* was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. [***55] Wright & A. Miller, Federal Practice and Procedure § 1216, p

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

207 (3d ed. 2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' . . .").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1* ("The liberal notice pleading of *Rule 8(a)* is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules,[2] put it thus:

> "Experience has shown . . . that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so [***56] that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The [*1977] New Federal Rules of Civil Procedure: The Last Phase--Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A. B. A. J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then [**953] crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C. App., p 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief--namely, the defendant's negligent driving--would have been called a "'conclusion of law'" under the code pleading of old. See, *e.g.*, Cook 419. But that bare allegation suffices under a system that "restrict[s] the pleadings to [***57] the task of general notice-giving and invest[s] the deposition-discovery

process with a vital role in the preparation for trial." *Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)*; see also *Swierkiewicz, 534 U.S., at 513, n. 4, 122 S. Ct. 992, 152 L. Ed. 2d 1* (citing Form 9 as an example of "'the simplicity and brevity of statement which the rules contemplate'"); *Thomson v. Washington, 362 F.3d 969, 970 (CA7 2004)* (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

> 2    *Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 283, 108 S. Ct. 1133, 99 L. Ed. 2d 296 (1988).*
> 3    The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," *Fed. Rule Civ. Proc. 9(b)*, neither of which has been alleged in this case. We have recognized that the canon of *expressio unius est exclusio alterius* applies to *Rule 9(b)*. See *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).*

II

[***58] It is in the context of this history that *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of *Rule 8*. *Id., at 47-48, 78 S. Ct. 99, 2 L. Ed. 2d 80.* In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.*

Consistent with the design of the Federal Rules, *Conley*'s "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond [***59] would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley*'s "no set of facts " language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante, at ____, 167 L. Ed. 2d, at 944*, the Court dismisses it as careless composition.

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

[*1978] If *Conley*'s "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzl[ed] the profession for 50 years," *ibid.,* has been cited as authority in a dozen opinions of this Court and four separate [**954] writings.[4]  In not one of those 16 opinions was the language "questioned," "criticized," or "explained away."  Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation.  Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language [***60] the majority repudiates:  whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief.[5]

4    *SEC v. Zandford,* 535 U.S. 813, 818, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002); *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999); *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993); *Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989); *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (per curiam); *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972) (per curiam); *Haines v. Kerner,* 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam); *Jenkins v. McKeithen,* 395 U.S. 411, 422, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969) (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 554, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin,* 466 U.S. 558, 587, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984) (Stevens, J., dissenting); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 561, n. 1, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977) (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 55, n. 6, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976) (Brennan, J., concurring in judgment).

[***61]
5    See, *e.g.,* *EB Invs., LLC v. Atlantis Development, Inc.,* 930 So. 2d 502, 507 (Ala. 2005); *De-*

*partment of Health & Social Servs. v. Native Village of Curyung,* 151 P. 3d 388, 396 (Alaska 2006); *Newman v. Maricopa Cty.,* 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App. 1991); *Public Serv. Co. of Colo. v. Van Wyk,* 27 P. 3d 377, 385-386 (Colo. 2001) (en banc); *Clawson v. St. Louis Post-Dispatch, LLC,* 906 A.2d 308, 312 (D. C. 2006); *Hillman Constr. Corp. v. Wainer,* 636 So. 2d 576, 578 (Fla. App. 1994); *Kaplan v. Kaplan,* 266 Ga. 612, 613, 469 S. E. 2d 198, 199 (1996); *Wright v. Home Depot U.S.A.,* 111 Haw. 401, 406, 142 P. 3d 265, 270 (2006); *Taylor v. Maile,* 142 Idaho 253, 257, 127 P. 3d 156, 160 (2005); *Fink v. Bryant,* 2001-CC-0987, p. 4 (La. 11/28/01), 801 So. 2d 346, 349; *Gagne v. Cianbro Corp.,* 431 A.2d 1313, 1318-1319 (Me. 1981); *Gasior v. Massachusetts Gen. Hospital,* 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); *Ralph Walker, Inc. v. Gallagher,* 926 So. 2d 890, 893 (Miss. 2006); *Jones v. Montana Univ. System,* 337 Mont. 1, 7, 155 P. 3d 1247, ____ (2007); *Johnston v. Neb. Dep't of Corr. Servs.,* 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006); *Blackjack Bonding v. Las Vegas Munic. Ct.,* 116 Nev. 1213, 1217, 14 P. 3d 1275, 1278 (2000); *Shepard v. Ocwen Fed. Bank,* 361 N. C. 137, 139, 638 S. E. 2d 197, 199 (2006); *Rose v. United Equitable Ins. Co.,* 2001 ND 154, P10, 632 N.W.2d 429, 434; *State ex rel. Turner v. Houk,* 112 Ohio St. 3d 561, 562, 2007-Ohio-814, P5, 862 N.E.2d 104, 105 (per curiam); *Moneypenney v. Dawson,* 2006 OK 53, P2, 141 P. 3d 549, 551; *Gagnon v. State,* 570 A.2d 656, 659 (R. I. 1990); *Osloond v. Farrier,* 2003 SD 28, P4, 659 N.W.2d 20, 22 (per curiam); *Smith v. Lincoln Brass Works, Inc.,* 712 S.W.2d 470, 471 (Tenn. 1986); *Association of Haystack Property Owners v. Sprague,* 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); *In re Coday,* 156 Wn. 2d 485, 497, 130 P. 3d 809, 815 (2006) (en banc); *Haines v. Hampshire Cty. Comm'n,* 216 W. Va. 499, 502, 607 S. E. 2d 828, 831 (2004); *Warren v. Hart,* 747 P.2d 511, 512 (Wyo. 1987); see also *Malpiede v. Townson,* 780 A.2d 1075, 1082-1083 (Del. 2001) (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); *Canel v. Topinka,* 212 Ill. 2d 311, 318, 818 N.E.2d 311, 317, 288 Ill. Dec. 623 (2004) (replacing "appears beyond doubt" in the *Conley* formulation with "is clearly apparent"); *In re Young,* 522 N.E.2d 386, 388 (Ind. 1988) (per curiam) (replacing "appears beyond doubt" with

"appears to a certainty"); *Barkema v. Williams Pipeline Co., 666 N.W.2d 612, 614 (Iowa 2003)* (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); *Pioneer Village v. Bullitt Cty., 104 S. W. 3d 757, 759 (Ky. 2003)* (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); *Corley v. Detroit Bd. of Ed., 470 Mich. 274, 277, 681 N.W.2d 342, 345 (2004) (per curiam)* (holding that a motion for judgment on the pleadings should be granted only "'if no factual development could possibly justify recovery'"); *Oberkramer v. Ellisville, 706 S.W.2d 440, 441 (Mo. 1986) (en banc)* (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd., 795 P.2d 622, 624 (Utah 1990)* (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); *NRC Mgmt. Servs. Corp. v. First Va. Bank - Southwest, 63 Va. Cir. 68, 70 (2003)* ("The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

[***62]  [*1979] Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed [**955] briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process--a rulemaking process--for revisions of that order. See *28 U.S.C. §§ 2072-2074 (2000 ed. and Supp. IV).*

Today's majority calls *Conley*'s "'no set of facts'" language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Ante, at ____, 167 L. Ed. 2d, at 945.* This is not and cannot be what the *Conley* Court meant. First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts.[6] The "pleading standard" label the majority gives to what it reads into the *Conley* opinion--a statement of the permissible factual support for an adequately [***63] pleaded complaint--would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither

need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of the complaint." [*1980] *355 U.S., at 45, 78 S. Ct. 99, 2 L. Ed. 2d 80* (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante, at ____ - ____, 167 L. Ed. 2d, at 945.*

6   The majority is correct to say that what the Federal Rules require is a "'showing'" of entitlement to relief. *Ante, at ____, n 3, 167 L. Ed. 2d, at 940.* Whether and to what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra, at ____, 167 L. Ed. 2d, at 949.* Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

[***64] We can be triply sure as to *Conley*'s meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of [**956] facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* In the first case, *Leimer v. State Mut. Life Assur. Co. of Worcester, Mass., 108 F.2d 302 (CA8 1940),* the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, "'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.'" *Id., at 305* (quoting *Winget v. Rockwood, 69 F.2d 326, 329 (CA8 1934)).*

The *Leimer* court viewed the Federal Rules--specifically *Rules 8(a)(2), 12(b)(6), 12(e)* (motion for [***65] a more definite statement), and 56 (motion

for summary judgment)--as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *108 F.2d at 306*. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer*'s admonition in *Continental Collieries, Inc. v. Shober, 130 F.2d 631 (1942)*, which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state [***66] law. The Court of Appeals reversed, concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer*: "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." *130 F.2d at 635*.

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning, 139 F.2d 774 (CA2 1944)*, the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it--and indeed for an amount equal to the plaintiff's own bid--and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant [***67]

"could have disclosed the facts from his point of view, in advance of a trial if he [*1981] chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so [**957] firmly believes and what for present purposes defendant must be taken as admitting." *Id., at 775*.

As any civil procedure student knows, Judge Clark's opinion disquieted the defense bar and gave rise to a movement to revise *Rule 8* to require a plaintiff to plead a "'cause of action.'" See 5 Wright & Miller § 1201, at 86-87. The movement failed, see *ibid.; Dioguardi* was explicitly approved in *Conley;* and "[i]n retrospect the case itself seems to be a routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer, Continental Collieries*, and *Dioguardi, Conley*'s statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling," *ante, at ____, 167 L. Ed. 2d, at 945*. It reflects a philosophy that, unlike [***68] in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley*'s language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley*. For example, in *Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*, we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized that

"[w]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id., at 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90* (emphasis added). [***69]

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes, 471 F.2d 430, 433 (CA6 1972)*. We reversed the Court of Appeals on the ground that "[w]hatever the plaintiffs may or may not be

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the *Eleventh Amendment* because they were styled as suits against the defendants in their individual capacities. *416 U.S., at 238, 94 S. Ct. 1683, 40 L. Ed. 2d 90.*

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).* Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," [***70] *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,* [**958] *954 F.2d 1054, 1057 (1992)* (internal quotation marks omitted), by requiring a plaintiff to "state with factual detail and [*1982] particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." *Leatherman, 507 U.S., at 167, 113 S. Ct. 1160, 122 L. Ed. 2d 517* (internal quotation marks omitted). We found this language inconsistent with *Rules 8(a)(2)* and *9(b)* and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to *Rule 9(b)*], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id., at 168-169,113 S. Ct. 1160, 122 L. Ed. 2d 517.*

Most recently, in *Swierkiewicz, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1,* we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting [***71] evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See, e.g., Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985).* Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework

does not apply in every employment discrimination case." *Swierkiewicz, 534 U.S., at 511, 122 S. Ct. 992, 152 L. Ed. 2d 1.* We also observed that *Rule 8(a)(2)* does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious [***72] claims." *Id., at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1;* see Brief for United States et al. as *Amici Curiae* in *Swierkiewicz* v. *Sorema N. A.,* O. T. 2001, No. 00-1853, p 10 (stating that a *Rule 12(b)(6)* motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)).[7]

> 7   See also 5 Wright & Miller § 1202, at 89-90 ("[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

As in the discrimination context, we have developed [***73] an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See *Matsushita* [**959] *Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* Under *Matsushita,* a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a *Rule 56* motion, a § 1 plaintiff "must present evidence 'that tends to exclude [*1983] the possibility' that the alleged conspirators acted independently." *Id., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538* (quoting *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)).* That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." *475 U.S., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538.*

Everything today's majority says would therefore make perfect sense if it were ruling on a *Rule 56* motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* [***74]

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because--in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior--the claimed conspiracy is "conceivable" but not "plausible," *ante, at ____, 167 L. Ed. 2d, at 949*. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with *Rule 8* and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)* [***75] (quoting *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962))*; see also *Knuth v. Erie-Crawford Dairy Cooperative Asso., 395 F.2d 420, 423 (CA3 1968)* ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League, 352 U.S. 445, 454, 77 S. Ct. 390, 1 L. Ed. 2d 456 (1957)* ("Congress itself has placed the private antitrust litigant in a most favorable position . . . . In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to [**960] engage in armchair economics at the pleading stage.

The same year we decided *Conley* [***76] , Judge Clark wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of

the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular.*" Special Pleading in the "Big Case"? in Procedure--The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds. 1965) (hereinafter [*1984] Clark, Special Pleading in the Big Case) (emphasis added).

In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted.[8] While the majority assures us that it is not applying any "'heightened'" pleading standard, see *ante, at ____, n 14, 167 L. Ed. 2d, at 948-949*, I shall now explain why I have a difficult time understanding its opinion any other way.

8   Our decision in *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *Id., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577*. Here, the failure the majority identifies is not a failure of notice--which "notice pleading" rightly condemns--but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of *notice* but of *proof*, it should not be answered without first hearing from the defendants (as apart from their lawyers). Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries as alleged were not "the type that the antitrust statute was intended to forestall." *Id., at 540, 103 S. Ct. 897, 74 L. Ed. 2d 723*; see *id., at 526, 103 S. Ct. 897, 74 L. Ed. 2d 723* ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

or that the defendants have violated the antitrust laws in ways that have not been alleged").

[***77] III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, *see, e.g., Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526-527, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).* Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489-490, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977).* Rather, the theory on which the Court permits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists [**961] to take affirmative steps to facilitate entry to new competitors, *see Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004);* it also permitted the existing firms to compete with each [***78] other and to expand their operations into previously forbidden territory. See *47 U.S.C. § 271.* Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, PP 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court [*1985] recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante, at ____ - ____, 167 L. Ed. 2d, at 940.*

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel [***79] conduct. *Ante, at ____, 167 L. Ed. 2d, at 946.* The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra, at ____ - ____, 167 L. Ed. 2d, at 938-939.* That distinction was a defining feature of code pleading,

see generally Clark, The Complaint in Code Pleading, 35 Yale L. J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Ass'n, 347 U.S. 186, 188, 74 S. Ct. 452, 98 L. Ed. 618 (1954)* (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "[w]hether these charges be called 'allegations of fact' or 'mere conclusions of the pleader'"); *Brownlee v. Conine, 957 F.2d 353, 354 (CA7 1992)* ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, . . . so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 3-4 (CA9 1963)* ("[O]ne purpose of Rule 8 [***80] was to get away from the highly technical distinction between statements of fact and conclusions of law . . ."); *Oil, Chemical & Atomic Workers Int'l Union v. Delta, 277 F.2d 694, 697 (CA6 1960)* ("Under the notice system of pleading established by the Rules of Civil Procedure, . . . the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," *see Form 9; supra, at [**962] ____, 167 L. Ed. 2d, at 952.* Indeed it is less of one.[9]

9  The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by Rule 8 because it lacks specificity. *Ante, at ____ - ____, n 10, 167 L. Ed. 2d, at 946.* The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement. See *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).* Petitioners made no such motion and indeed have conceded that "[o]ur problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," *ante, at ____, n 10, 167 L. Ed. 2d, at 946,* is, for our purposes, academic.

[***81] Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that

"[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."  A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952).  I am not so cynical as to accept that sentiment at face value, but I need not do so here.  Respondents' complaint [*1986] points not only to petitioners' numerous opportunities to meet with each other, Complaint P 46, App. 23,[10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," id., P 42, App. 22.  What did he mean by that?  One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest [***82] to compete with its brethren, he had agreed with his competitors not to do so.  According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, id., P 44, App. 22 (calling the statement "evidence of potential collusion among regional Bell phone monopolies to not compete against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, id., P 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs'"very apparent non-competition policy" was coordinated).

10  The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade.  Ante, at ____, n 12, 167 L. Ed. 2d, at 947.  Quite the contrary:  an allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with--though not sufficient to prove--the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement.  Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," ante, at ____, 167 L. Ed. 2d, at 946, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

[***83] Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run.  That's what his lawyers tell us anyway.  See Brief for Petitioners 36.  But I would think that no one would know better what Notebaert meant than Notebaert himself.  Instead of permitting respondents to ask Notebaert, however, the Court looks to other [**963] quotes from that and other articles and decides that what he meant was that entering new markets as a CLEC would not be a "'sustainable economic model.'"  Ante, at ____, n 13, 167 L. Ed. 2d, at 948.  Never mind that--as anyone ever interviewed knows--a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity.  But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor.[11]  See Allen v. Wright, 468 U.S. 737, 768, n. 1, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).  The inference the statement supports--that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to do so were the product of an agreement--sits comfortably within [***84] the realm of possibility.  That is all the Rules require.

11  It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, ante, at ____, n 13, 167 L. Ed. 2d, at 948.  Under Federal Rule of Evidence 201(b), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint.  On the other hand, I surely would not have dismissed the complaint [*1987] without requiring the defendants to answer the charge that they "have agreed not to compete with [***85] one another and otherwise allocated customers and markets to one another."[12]  P 51, App. 27.  Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

12  The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin."  Ante, at ____, n 10, 167 L. Ed. 2d, at 946.  A defendant could, of course, begin by either denying or admitting the charge.

Respondents in this case proposed a plan of "'phased discovery'" limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation.[13] Given the charge in the complaint--buttressed [**964] by the common sense of Adam Smith--I cannot say that the possibility that joint discussions [***86] [*1988] and perhaps some agreements played a role in petitioners' decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity to prove their claims. See Clark, New Federal Rules 977 ("[T]hrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof*, and do not need to force the pleadings to their less appropriate function").

13   The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante, at ____, n 6, 167 L. Ed. 2d, at 943*, is no reason to throw the baby out with the bathwater.   The Court vastly underestimates a district court's case-management arsenal.   Before discovery even begins, the court may grant a defendant's *Rule 12(e)* motion; *Rule 7(a)* permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)*; and *Rule 23* requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*; see *In re Initial Public Offering Securities Litigation, 471 F.3d 24 (CA2 2006)* (holding that a district court may not certify a class without ruling that each *Rule 23* requirement is met, even if a requirement overlaps with a merits issue). *Rule 16* invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia*, "the elimination of frivolous claims or defenses," *Rule 16(c)(1)*; "the necessity or desirability of amendments to the pleadings," *Rule 16(c)(2)*; "the control and scheduling of discovery," *Rule 16(c)(6)*; and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," *Rule 16(c)(12)*. Subsequently, *Rule 26* confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See *523 U.S., at 598-599, 118 S. Ct. 1584, 140 L. Ed. 2d 759*. Indeed, *Rule 26(c)* specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope. In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility vel non without requiring an answer from the defendant.  See *Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 206, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958)* ("*Rule 34* is sufficiently flexible to be adapted to the exigencies of particular litigation").   And should it become apparent over the course of litigation that a plaintiff's filings bespeak an in terrorem suit, the district court has at its call its own in terrorem device, in the form of a wide array of *Rule 11* sanctions. See *Rules 11(b), (c)* (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991)* (holding that *Rule 11* applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer, 232 F.R.D. 116, 126 (DC 2005)* ("As possible sanctions pursuant to *Rule 11*, the court has an arsenal of options at its disposal").

[***87] I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence.  It is no surprise that the antitrust defense bar--among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante, at ____, 167 L. Ed. 2d, at 942*--should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public."   Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules--not our interpretation of them.[14]  See *Swierkiewicz, 534 U.S., at 515, 122 S. Ct. 992, 152 L. [**965] Ed. 2d 1; Crawford-El v. Britton, 523 U.S. 574,*

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

*595, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); Lea-*
*therman, 507 U.S., at 168, 113 S. Ct. 1160, 122 L. Ed. 2d*
*517.*

14    Given his "background in antitrust law,"
*ante, at ____, n 6, 167 L. Ed. 2d, at 943,* Judge
Easterbrook has recognized that the most effec-
tive solution to discovery abuse lies in the legis-
lative and rulemaking arenas. He has suggested
that the remedy for the ills he complains of re-
quires a revolution in the rules of civil procedure:

"Perhaps a system in which
judges pare away issues and focus
on investigation is too radical to
contemplate in this coun-
try--although it prevailed here be-
fore 1938, when the Federal Rules
of Civil Procedure were adopted.
The change could not be accom-
plished without abandoning notice
pleading, increasing the number of
judicial officers, and giving them
more authority . . . .  If we are to
rule out judge-directed discovery,
however, we must be prepared to
pay the piper.  Part of the price is
the high cost of unnecessary dis-
covery--impositional and other-
wise."  Discovery as Abuse, *69 B.
U. L. Rev. 635, 645 (1989).*

[***88] IV

Just a few weeks ago some of my colleagues ex-
plained that a strict interpretation of the literal text of
statutory language is essential to avoid judicial decisions
that are not faithful to the intent of Congress. *Zuni Pub.
Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. ___, ___,
127 S. Ct. 1534, 167 L. Ed. 2d 449 (2007)* (Scalia, J.,
dissenting). I happen to believe that there are cases in
which other tools of construction are more reliable than
text, but I agree of course that congressional intent
should guide us in matters of statutory interpretation.
*Id., at ___, 127 S. Ct. 1534, 167 L. Ed. 2d 449* (Stevens,
J., concurring). This is a case in which the intentions of
the drafters of three important sources of law--the Sher-
man Act, the Telecommunications Act of 1996, and the
Federal Rules of Civil Procedure--all point unmistakably
in the same direction, yet the Court marches resolutely

the other way. Whether the Court's actions will benefit
only defendants in antitrust treble-damages cases, or
whether its test for the sufficiency of a complaint will
inure to the benefit of all civil defendants, is a question
that the future will answer. But that the Court has an-
nounced a significant new rule that does not even purport
to [***89] respond [*1989] to any congressional
command is glaringly obvious.

The transparent policy concern that drives the deci-
sion is the interest in protecting antitrust defen-
dants--who in this case are some of the wealthiest corpo-
rations in our economy--from the burdens of pretrial
discovery. *Ante, at ____ - ____, 167 L. Ed. 2d, at
942-943.* Even if it were not apparent that the legal fees
petitioners have incurred in arguing the merits of their
*Rule 12(b)* motion have far exceeded the cost of limited
discovery, or that those discovery costs would burden
respondents as well as petitioners,[15] that concern would
not provide an adequate justification for this
law-changing decision. For in the final analysis it is
only a lack of confidence in the ability of trial judges to
control discovery, buttressed by appellate judges' inde-
pendent appraisal of the plausibility of profoundly se-
rious factual allegations, that could account for this stark
break from precedent.

15    It would be quite wrong, of course, to as-
sume that dismissal of an antitrust case after dis-
covery is costless to plaintiffs. See *Fed. Rule
Civ. Proc. 54(d)(1)* ("[C]osts other than attorneys'
fees shall be allowed as of course to the prevail-
ing party unless the court otherwise directs").

[***90] If the allegation of conspiracy happens to
be true, today's decision obstructs the congressional pol-
icy favoring competition that undergirds both the Tele-
communications Act of 1996 and the Sherman Act itself.
More importantly, even if there is abundant evidence that
the allegation is untrue, directing that the case be dis-
missed without even looking at any of that evidence
marks a fundamental--and unjustified--change in the
character of pretrial practice.

Accordingly, I respectfully dissent.

REFERENCES
15 U.S.C.S. § 1

*Antitrust Laws and Trade Regulation §§ 11.02, 164.01,
164.02* (Matthew Bender)

*Moore's Federal Practice §§ 8.02, 12.03* (Matthew
Bender 3d ed.)

L Ed Digest, Restraints of Trade, Monopolies, and Un-
fair Trade Practices § 45

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

L Ed Index, Sherman Act

Supreme Court's construction and application of *Rules 8 and 9 of Federal Rules of Civil Procedure*, concerning general rules of pleading and pleading special matters. *122 L. Ed. 2d 897*.

Supreme Court's views as to what constitutes per se illegal "price fixing" under the Sherman Act (*15 U.S.C.S. § 1 et seq.*). *64 L. Ed. 2d 997*.

Applicability of federal antitrust laws as affected by other federal statutes or by Federal Constitution--Supreme Court cases. *45 L. Ed. 2d 841*.

LEXSEE 2008 U.S. DIST. LEXIS 5972 AT *10

**JOSEPH LEE VAN PATTEN and JOHN ALLEN ECCLES, Plaintiffs, v. RAN-
DALL WRIGHT, STEPHEN P. BURROUGHS, CHRISTINE MARIE SKRINSKA,
and DR. BUTLER, Defendants.**

**Case No. 07-C-0788**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
WISCONSIN**

*2008 U.S. Dist. LEXIS 5972*

**January 15, 2008, Decided
January 15, 2008, Filed**

**COUNSEL:** [*1] Joseph L Van Patten, Plaintiff, Pro
se, Shawano, WI.

John Allen Eccles, Plaintiff, Pro se, Shawano, WI.

**JUDGES:** J.P. Stadtmueller, U.S. District Judge.

**OPINION BY:** J.P. Stadtmueller

**OPINION**

**DECISION AND ORDER**

Plaintiffs, Joseph Lee Van Patten and John Allen
Eccles, filed this joint *pro se* civil rights action under *42
U.S.C. § 1983*. This matter comes before the court on the
plaintiffs' petitions to proceed *in forma pauperis*.

Pursuant to *28 U.S.C. § 1915(b)(1)*, each plaintiff is
required to pay the statutory filing fee of $ 350.00 for
this action. *See also Boriboune v. Berge, 391 F.3d 852,
855 (7th Cir. 2004)*(when proceeding *in forma pauperis*,
one filing fee per plaintiff is required). If a prisoner does
not have the money to pay the filing fee, he or she can
request leave to proceed *in forma pauperis*. To proceed
with an action *in forma pauperis*, the prisoner must com-
plete a petition and affidavit to proceed *in forma paupe-
ris* and return it to the court with a certified copy of the
prisoner's trust account statement showing transactions
for the prior six months. The court then assesses and,
when funds exist, collects from the plaintiff at the time
the action is filed an initial partial filing fee of 20% of
the average [*2] monthly deposits to or the average
monthly balance in the prisoner's trust account for the
six-month period immediately preceding the filing of the
complaint. [1]

1   In no event will a prisoner be prohibited from
bringing a civil action because he or she has no
assets and no means by which to pay the initial
partial filing fee. *28 U.S.C. § 1915(b)(4)*.

In this case, each plaintiff has submitted a certified
copy of his prison trust account statement for the
six-month period immediately preceding the filing of the
complaint. Plaintiff Van Patten has been assessed and
paid an initial partial filing fee of $ 2.00. Plaintiff Eccles
has been assessed and paid an initial partial filing fee of
$ 8.10. [2] Thus, the plaintiffs' petitions to proceed *in for-
ma pauperis* will be granted.

2   To date, plaintiff Eccles has paid $ 18.20 of
the $ 355.00 filing fee.

The court is required to screen complaints brought
by prisoners seeking relief against a governmental entity
or officer or employee of a governmental entity. *28
U.S.C. § 1915A(a)*. The court must dismiss a complaint
or portion thereof if the prisoner has raised claims that
are legally "frivolous or malicious," that fail to state a
claim upon which relief [*3] may be granted, or that
seek monetary relief from a defendant who is immune
from such relief. *28 U.S.C. § 1915A(b)*.

A claim is legally frivolous when it lacks an argua-
ble basis either in law or in fact. *Denton v. Hernandez,
504 U.S. 25, 31, 112 S. Ct. 1728, 118 L. Ed. 2d 340
(1992); Neitzke v. Williams, 490 U.S. 319, 325, 109 S.
Ct. 1827, 104 L. Ed. 2d 338 (1989); Hutchinson ex rel.
Baker v. Spink, 126 F.3d 895, 900 (7th Cir. 1997)*. The
court may, therefore, dismiss a claim as frivolous where
it is based on an indisputably meritless legal theory or
where the factual contentions are clearly baseless.
*Neitzke, 490 U.S. at 327*. "Malicious," although some-
times treated as a synonym for "frivolous," "is more

usefully construed as intended to harass." *Lindell v. McCallum, 352 F.3d 1107, 1109-10 (7th Cir. 2003)* (citations omitted).

To avoid dismissal for failure to state a claim, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a).* It is not necessary for the plaintiffs to plead specific facts; their statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus, U.S.     , 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)* (citations [*4] omitted). In deciding whether the complaint states a claim, the court must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp. v. Twombly,     U.S.     , 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).* There is no heightened pleading requirement for *pro se* prisoner civil rights complaints. *Thomson v. Washington, 362 F.3d 969, 970-71 (7th Cir. 2004).* Of course, if a complaint pleads facts that show that the plaintiffs do not have a claim, the complaint should be dismissed "without further ado." *Id. at 970.*

To state a claim for relief under *42 U.S.C. § 1983,* the plaintiffs must allege: 1) that they were deprived of a right secured by the Constitution or laws of the United States; and 2) that the deprivation was visited upon them by a person acting under color of state law. *Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980).* The court is obliged to give the plaintiffs' *pro se* allegations, however inartfully pleaded, a liberal construction. *See Erickson, 127 S. Ct. at 2200* (quoting *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).*

## A. Background

At all times relevant, plaintiffs Van Patten and Eccles were incarcerated at the Shawano County Jail. Defendant Christine Marie Skrinska is [*5] a nurse employed at the jail. Defendant Dr. Butler is a physician who provides medical treatment to jail inmates. The complaint also names Stephen P. Burroughs and Randall Wright as defendants, who appear to be jail officials, although the complaint does not explicitly state so.

The plaintiffs assert that, on various dates in 2007, they were subjected to "constant abusive denial of medical care and medications" in violation of the *Eighth Amendment.* (Complaint at 3). With respect to plaintiff Eccles, who was admitted to the jail on May 31, 2007, he alleges that jail officials neglected to provide him with adequate medical care for several medical conditions that he experienced prior to his incarceration. Specifically, Eccles entered the jail with a broken left wrist in a cast and he suffers from bipolar disorder and epilepsy.

At the time of his arrival at the jail, Eccles was taking several medications that had been prescribed for him by his personal physician. However, upon booking, defendants Skrinska and Butler seized all of Eccles' medications. As a result, Eccles suffered minor epileptic seizures, severe depression and pain in his wrist.

Plaintiff Eccles wrote more than 80 complaints [*6] to jail officials requesting medical care. Eventually, he was allowed one visit with his primary doctor, who determined that specialized orthopedic surgery was necessary. The defendants, however, refused to provide Eccles with the surgery because it was not ordered by a jail physician. According to plaintiff Eccles, he notified all the defendants that he suffered from several medical conditions and that he considered their failure to provide him with medical care a violation of his constitutional rights.

For his part, plaintiff Van Patten avers that he was denied medical care for several days after he was badly bitten by insects in the G-pod unit. Instead of providing him with prompt medical care, defendant Skrinska told Van Patten to clean the pod in the morning.

Plaintiff Van Patten further asserts that he was denied medication and medical treatment for his heart condition, hypertension and high blood pressure. Defendant Skrinska told Van Patten that his prescriptions from other doctors would not be honored at the jail and that he would have to pay $ 10.00 to see the doctor to receive medication. In the alternative, defendant Skrinska told Van Patten that she could evaluate him and [*7] order treatment.

Plaintiff Van Patten also alleges that he has been denied dentures for over 19 months. Defendants Burroughs and Wright told Van Patten that he would have to pay $ 2,500.00 if he wanted to see a dentist. Additionally, Van Patten was informed that he would be required to pay for each deputy who accompanied him to the dentist. Van Patten avers that he bleeds daily and receives excessive cuts to his mouth as a result of being denied dentures.

## B. Analysis

The plaintiffs allege that they were denied adequate medical and dental care in violation of the *Eighth Amendment.* [3] To establish liability under the *Eighth Amendment,* a plaintiff must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001); see also Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).* A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001)* [*8] (quoting *Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997))*. [4] A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer, 511 U.S. at 837*. Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991)*.

> 3    Inasmuch as the plaintiffs are incarcerated at the Shawano County Jail, it appears that they are pretrial detainees and, therefore, any medical and dental care claims would arise under the *Fourteenth Amendment* as opposed to the *Eighth Amendment*. This distinction is immaterial, however, because *Eighth* and *Fourteenth Amendment* conditions of confinement claims are analyzed under the same legal standard. *See Whiting v. Marathon Co. Sheriff's Dep't, 382 F.3d 700, 703 (7th Cir. 2004)* ("the legal standard for a *§ 1983* claim is the same under either the *Cruel and Unusual Punishment Clause of the Eighth Amendment* or the *Due Process Clause of the Fourteenth Amendment*."). Therefore, the court will analyze the plaintiffs' claims under the *Eighth Amendment*.
> 4    The Court of Appeals for the Seventh Circuit has held that [*9] a dental condition may be considered a serious medical need. *See Board v. Farnham, 394 F.3d 469 (7th Cir. 2005)*.

In the present case, plaintiff Eccles asserts that he suffered from several serious medical conditions and the defendants refused to provide him with adequate care. Similarly, plaintiff Van Patten alleges that his medical and dental needs were not sufficiently treated. Therefore, the plaintiffs may proceed with their *Eighth Amendment* claims as stated herein.

With respect to multiple claim lawsuits filed by state prisoners, the Seventh Circuit recently held that "[u]nrelated claims against different defendants belong in different suits[.]" *George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007)*. Essentially, this means that the defendants may be joined in an action if there is "asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action." *Fed.R.Civ.P. 20(a)(2)(A) and (B)*. In the present case, the plaintiffs allege that the defendants violated their *Eighth Amendment* rights as part of a series [*10] of transactions or occurrences. Although it is unclear whether the plaintiffs will ultimately be able to

prove this assertion, the court has been instructed to construe such doubts in their favor. *See Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*. Therefore, the plaintiffs may proceed with their *Eighth Amendment* claims.

Next, the plaintiffs seek to litigate this case as a class action lawsuit. However, the plaintiffs do not allege that they satisfy the requirements of *Federal Rule of Civil Procedure 23(a)*. Under *Rule 23(a)*, a plaintiff can sue as a representative of or on behalf of parties only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Because the plaintiffs have not satisfied the requirement of *Rule 23(a)*, they can only bring their *Eighth Amendment* claims in their individual capacities and not on behalf of a class.

As a final matter, plaintiff Eccles has indicated that he overpaid the initial [*11] partial filing fee by $ 10.10 and he requests that the court refund him this amount. As discussed, Eccles was assessed an initial partial filing fee of $ 8.10. Review of the docket reveals that on September 20, 2007, Eccles' sister paid $ 10.10 to satisfy the initial partial filing fee. Subsequently, on September 24, 2007, $ 8.10 was withdrawn from the Eccles' prison trust account and sent to the court as payment for the filing fee.

Based on the foregoing, the court finds that plaintiff Eccles' sister paid the initial partial filing fee on his behalf. Therefore, any refund should be directed to her and not the plaintiff. If plaintiff Eccles' sister wishes for the $ 10.10 to be returned, she may file a written request with the court asking for a refund. However, the court will not disburse this amount to plaintiff Eccles.

In sum, the plaintiffs have stated claims that they were denied adequate medical and dental care under the *Eighth Amendment*. However, their class action claims will be dismissed.

**IT IS THEREFORE ORDERED** that plaintiff Van Patten's motion for leave to proceed *in forma pauperis* (Docket # 2) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff Eccles' motion for leave to proceed [*12] *in forma pauperis* (Docket # 3) is **GRANTED**.

**IT IS FURTHER ORDERED** the plaintiffs' class action claims are **DISMISSED** pursuant to *28 U.S.C. § 1915A* and *1915(e)(2)(B)*.

**IT IS FURTHER ORDERED** that plaintiff Eccles' request for a refund (Docket # 6) is **DENIED.**

**IT IS FURTHER ORDERED** that the United States Marshal shall serve a copy of the complaint, the summons, and this order upon the defendants pursuant to *Federal Rule of Civil Procedure 4.* The plaintiffs are advised that Congress requires the U.S. Marshals Service to charge for making or attempting such service. *28 U.S.C. § 1921(a).* The current fee for waiver-of-service packages is $ 8.00 per item mailed. The full fee schedule is provided at *28 C.F.R. §§ 0.114(a)(2), (a)(3).* Although Congress requires the court to order service by the U.S. Marshals Service precisely because *in forma pauperis* plaintiffs are indigent, it has not made any provision for these fees to be waived either by the court or by the U.S. Marshals Service.

**IT IS ALSO ORDERED** that the defendants shall file a responsive pleading to the complaint.

**IT IS FURTHER ORDERED** that the Secretary of the Wisconsin Department of Corrections or his designee shall collect from plaintiff Van [*13] Patten's prison trust account the $ 353.00 balance of the filing fee by collecting monthly payments from his prison trust account in an amount equal to 20% of the preceding month's income credited to the trust account and forwarding payments to the clerk of the court each time the amount in the account exceeds $ 10 in accordance with *28 U.S.C. § 1915(b)(2).* The payments shall be clearly identified by the case name and number assigned to this action.

**IT IS FURTHER ORDERED** that the Secretary of the Wisconsin Department of Corrections or his designee shall collect from plaintiff Eccles' prison trust account the $ 336.80 balance of the filing fee by collecting monthly payments from his prison trust account in an amount equal to 20% of the preceding month's income

credited to the trust account and forwarding payments to the clerk of the court each time the amount in the account exceeds $ 10 in accordance with *28 U.S.C. § 1915(b)(2).* The payments shall be clearly identified by the case name and number assigned to this action.

**IT IS ALSO ORDERED** that copies of this order be sent to the warden of the institution where the inmate is confined and to Corey F. Finkelmeyer, Assistant Attorney General, [*14] Wisconsin Department of Justice, P.O. Box 7857, Madison, Wisconsin, 53707-7857.

The plaintiffs are hereby notified that they are required to send a copy of every paper or document filed with the court to the opposing parties or their attorney(s). *Fed. R. Civ. P. 5(a).* The plaintiffs should also retain a personal copy of each document. If the plaintiffs do not have access to a photocopy machine, the plaintiffs may send out identical handwritten or typed copies of any documents. The court may disregard any papers or documents which do not indicate that a copy has been sent to each defendant or to their attorney(s).

The plaintiffs are further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the Clerk's Office of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated at Milwaukee, Wisconsin, this 15th day of January, 2008.

BY THE COURT:

/s/ J.P. Stadtmueller

J.P. Stadtmueller

U.S. District Judge